THE ATLANTA AND CHARLOTTE AIR LINE RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78077. Promulgated September 24, 1937.

W. T. Joyner, Esq., for the petitioner.

Lloyd B. Harrison, Esq., and E. C. Algire, Esq., for the respondent.

OPINION.

ARUNDELL: This proceeding is before us on income tax deficiencies of $2,204.80 determined by the respondent for each of the years 1930 and 1931. The principal issue is whether the petitioner is entitled to deductions to amortize discount on bonds issued in 1914, 1915, and 1917. By amended answer the respondent raised the question of the year in which taxes paid by the petitioner's lessee should be treated as petitioner's income. This question grows out of one as to petitioner's basis of accounting which was also raised by respondent's amended answer.

The evidence consists of a stipulation of facts, and the testimony of one witness who explained the petitioner's method of keeping books. The stipulation is lengthy and is accompanied by a number of exhibits. We summarize the facts.

The petitioner is a corporation, organized under the laws of North Carolina, South Carolina, and Georgia. It owns a line of railroad running from Charlotte, North Carolina, to Atlanta, Georgia. The railroad is operated by the Southern Railway Co., hereinafter called Southern, under an assignment of a lease dated March 26, 1881. Under the lease as it was effective prior to its amendment in 1914, the Southern maintained the property, paid all expenses of operation, including taxes, the interest on petitioner's outstanding bonds, dividends on petitioner's stock at the rate of 6 percent and petitioner's expenses of maintaining its corporate organization in the amount of $2,500 per year. Prior to June 30, 1914, petitioner's outstanding bonds, secured by a first mortgage, amounted to $5,500,000. All of the bonds were owned by the Southern, which had purchased them at par and deposited them with a trustee as collateral securing a bond issue of Southern.

In 1914 the petitioner and the Southern decided that it would be desirable to double-track the petitioner's railroad. This required additional funds and, to secure the funds, the Southern and the petitioner executed a supplemental lease agreement under date of June 30, 1914, and the petitioner executed a first mortgage under date of July 1, 1914, as security for additional bonds. The Southern was a

party to the mortgage. These two agreements together provided for the issue of first mortgage bonds in the amount of $20,000,000. The bonds were to be issued in two series. Series A bonds in the amount of $5,500,000 were to be sold and the proceeds used to retire the then outstanding bonds in the same amount. The proceeds of the series B bonds in the face amount of $14,500,000 were to be used for the purpose of double-tracking and improving the petitioner's railroad. As to the series B bonds, it was provided in the mortgage agreement that the trustee would deliver the bonds to the railroad company only when there should be deposited with the trustee an amount of money equal to the principal amount of the bonds delivered.

In 1914 the petitioner sold its series A bonds in the face amount of $5,500,000 to the public for $5,252,500. The petitioner received that amount in cash from the brokers through whom the bonds were sold. The petitioner also received from the Southern the sum of $247,500 in cash. The sum of these two amounts, $5,500,000, was used by petitioner to redeem its old bonds which were then owned by Southern. In its income tax return for the year ending June 30, 1915, the petitioner reported as income the $247,500 paid over to it by the Southern and paid a tax thereon. The petitioner deducted from its income for that year as amortized bond discount the sum of $8,250, being one-thirtieth of the sum of $247,500.

On July 19, 1915, the petitioner sold through brokers to the public series B bonds in the principal amount of $3,500,000, at 97½ percent of par value. The petitioner received from the sale of the bonds the sum of $3,412,500. The Southern on July 19, 1915, paid over to petitioner the sum of $87,500. The total of these sums was delivered by petitioner to the trustee, who thereupon certified out bonds in the face amount of $3,500,000 which were delivered to the purchasers.

On March 20, 1916, the petitioner sold to the public series B bonds in the amount of $7,000,000 at par. The Southern made no payment to the petitioner in connection with this sale.

On March 27, 1917, the petitioner sold through brokers series B bonds in the principal amount of $4,000,000 at 96½ percent of par value, and received therefor the sum of $3,860,000 in cash. Simultaneously the Southern paid over to the petitioner the sum of $140,000. The total of these sums was paid over by the petitioner to the trustee, who then certified out bonds in the face amount of $4,000,000 which were delivered to the purchasers.

In its income tax return for the year ending June 30, 1916, the petitioner reported as income the amount of $87,500 paid to it in that fiscal year by the Southern. The petitioner deducted in that year $8,250 as amortization of bond discount on its series A bonds and also $3,017.25 as one year's amortization of the $87,000 discount on

the first block of series B bonds. In its original return for the year ended June 30, 1917, the petitioner reported as income the $140,000 paid to it in that fiscal year by the Southern. The petitioner deducted in that return one year's amortization of each of the three discount items, namely, $247,500, $87,500, and $140,000. In a supplemental return the $140,000 was dropped as an income item and the three items of amortization were dropped as deductions.

The Southern did not buy any of the $20,000,000 face amount of bonds issued pursuant to the agreements entered into in 1914. The Southern was not a guarantor of the new bonds either as to the principal or interest. The Southern, under the agreement of June 30, 1914, agreed to pay to the petitioner, or its agent, annually amounts equivalent to 9 percent of petitioner's outstanding stock and further amounts equivalent to the interest on the new bonds.

There was never any promise or obligation on the part of the petitioner to repay to the Southern any of the aforesaid amounts of $247,500, $87,500, and $140,000.

In its returns for 1930 and 1931 the petitioner reported as income the amounts paid to or for it by the Southern which were equivalent to dividends on stock and interest on bonds and also the amount of income tax paid by the Southern on such income. The petitioner claimed as deductions in those returns proportionate amounts of the above discount items on both the series A and series B bonds. The respondent disallowed the amortization deductions.

The petitioner, in claiming discount deductions, places emphasis on the relation between it and the purchasers of the bonds. It says that the purchasers of the bonds did not pay face value, but paid a lesser sum, and that when the bonds mature it will be obliged to pay to the holders the full face value. Southern was not a purchaser of the bonds, and petitioner says that the amounts paid in by Southern can not be treated as part of the selling price of the bonds so as to make up the discount at which the bonds were sold to the purchasers thereof.

The Commissioner regards bond discount primarily as a loss. In this case, he says, there was no loss to the petitioner in view of the fact that Southern paid in the difference between face value and issuing price.

The Commissioner's regulations have for many years provided for the deduction of bond discount by prorating or amortizing the net amount of the discount over the life of the bonds. These regulations are interpreted by the Supreme Court as classifying discount as a loss sustained on payment of the bonds at maturity. *Helvering* v. *Union Pacific R. Co.*, 293 U. S. 282. The statutory provision for losses is that "losses sustained during the taxable year and not com-

pensated for by insurance or otherwise" are deductible. Assuming the correctness of petitioner's premise, namely, that only the amount paid in by the purchasing public represented the selling price of the bonds, it would follow that there was a loss. It does not follow, however, that the loss is necessarily deductible either through amortization or otherwise. The statute limits the deductible losses to those not compensated for by insurance or otherwise. In this case the difference between face value and the amount paid in by the purchasers of the bonds was "compensated for" by payments made by Southern. Under the lease and mortgage agreements of 1914 one of the requirements as to series B bonds was that the full face value of the bonds was to be paid in to the trustee before the trustee would certify the bonds out for delivery. In practice, the same procedure was followed as to both series A and B bonds. That is, the petitioner actually received and had in its hands the full face value of the entire issue of $20,000,000 before the bonds were issued, and it turned over the full amount to the trustee. From the stipulated facts and the vouchers in evidence, it appears that Southern made its payments to petitioner simultaneously with petitioner's receipt of the proceeds of the sales to the public, so that at no time was petitioner's obligation greater than its receipts. But even if there were a short lapse between receipts from the public sales and the payments by Southern, so that petitioner's obligations at maturity were greater than its receipts, and if that difference can be said to be a loss, that difference was compensated for by Southern's payment and the loss is not an allowable deduction. If a question be raised as to why the Southern compensated petitioner for the difference, the answer is that the Southern was a party to the mortgage agreement under which the bonds were issued, and that agreement required the full amount to be paid in to the trustee before issuance of the bonds and before the proceeds would be available for the Southern's use in improving the railroad. We conclude on this point that petitioner sustained no deductible loss on the sale of its bonds and there was therefore no amount to be amortized in the taxable years.

The respondent, by affirmative allegation, has raised the question of whether the petitioner's books were kept on the cash or accrual basis. In their brief, counsel for the respondent urge this question only with reference to the income resulting to the petitioner by reason of the payment of its income taxes by Southern. At the hearing, it was urged that a taxpayer on the cash basis may not amortize bond discount.

The accounts carried on the petitioner's books were merely skeleton accounts. As it is not an operating company it has only a few items of income and deductions to record. Its journal entries for the

months of December of each of the years 1930 and 1931 cover, in each instance, only parts of four pages. Among the items recorded are: Unmatured interest accrued; unmatured dividends declared; rent suspense; interest matured unpaid. According to the evidence the entries were actually made in December of each year. They did, however, record the financial events of the year on an accrual basis. The descriptive terms used are not found in a cash system. We accordingly find as a fact that petitioner's accounts were kept on the accrual basis. It follows that the amount of its taxes for 1930, which were paid by Southern, constituted accruable income for that year; likewise, the amount of its 1931 taxes were income for 1931.

*Decision will be entered under Rule 50.*