SOUTHEASTERN MAIL TRANSPORT, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Southeastern Mail Transport, Inc. v. Commissioner
Docket No. 40953-84
United States Tax Court
T.C. Memo 1992-252; 1992 Tax Ct. Memo LEXIS 276; 63 T.C.M. (CCH) 2893; April 30, 1992, Filed *276 Decision will be entered under Rule 155. Jones E. Davis, for petitioner. Francis C. Mucciolo, for respondent. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal corporate income tax in the amount of $ 328,549 for its fiscal year ended June 30, 1981. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in question, and all Rule references are to the Tax Court Rules of Practice and Procedure. After a concession, [1] the issues for decision are: (1) Whether petitioner regularly used the cash or the accrual method of accounting, and whether respondent is entitled to recompute petitioner's income using the cash method of accounting; (2) Whether petitioner's gross income for the taxable year properly includes $ 369,831.38 compensation the United States Postal Service withheld from petitioner at the direction of the Department of Labor, and whether petitioner may deduct this same amount; (3) Whether petitioner is entitled to reduce its gross income by $ 1,483,103.24, the amount of a loan petitioner allegedly received from one of its suppliers; *277 (4) Whether petitioner is entitled to deduct certain expenses it incurred but did not pay during the taxable year; (5) Whether petitioner has substantiated and is entitled to deduct certain miscellaneous expenses it allegedly incurred and paid during the taxable year; (6) Whether petitioner is entitled under section 165 to deduct $ 330,513.05 for losses allegedly sustained on the repossession of its tractors; (7) Whether petitioner is entitled under section 166 to deduct $ 1,785,064.74 in alleged bad debts owing to petitioner from the owner-operators; (8) Whether petitioner is entitled under section 165 to deduct $ 639,811.81 in losses from judgments petitioner's creditors allegedly obtained against petitioner. [2]
*278 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Southeastern Mail Transport, Inc., had its principal office in Jacksonville, Florida, at the time it filed its petition. From July of 1977, through June 30, 1981, Tony E. Davis (Davis) served as petitioner's president and chairman of the board and owned 100 percent of petitioner's outstanding stock. Petitioner engaged in the business of transporting mail under contracts with the United States Postal Service (Postal Service). A single mail contract covers a run between two cities. Davis was a sole proprietor when he started in the mail-transport business and had only one contract transporting mail from Jacksonville, Florida, to Lakeman, Florida. Davis operated under this one contract from 1970 until late 1975 when another contractor subcontracted two additional smaller runs to him. In 1977 Davis incorporated petitioner and obtained the remainder of petitioner's Postal Service contracts through the competitive bidding *279 process. During the taxable year in issue petitioner operated under 17 contracts of varying distances between a total of 18 different cities. In 1981 petitioner was experiencing cash flow problems, and Davis decided to engage a consultant to try to remedy the situation. Petitioner engaged the services of Lewis C. Lawhorn (Lawhorn). Prior to that engagement, Lawhorn had already been serving as the trustee over a payroll account for paying co-drivers, as will be discussed below. As a condition to providing his services as a consultant, Lawhorn asked for and received full control over petitioner, including sole signatory authority over petitioner's various checking accounts. Lawhorn consulted for petitioner for 2 or 3 months during 1981 and prior to May 1981. Early in May of 1981, petitioner entered into a contract to sell all of its assets to Federal Postal Carriers, Inc. (FPC), a Florida corporation owned and operated by James R. Georges, Jr. (Georges). The contract's closing date was contingent upon the occurrence of certain conditions, including the Postal Service's agreeing to have petitioner's contracts assigned to the purchaser. In order to ensure against petitioner's *280 financial decline during the period before closing, FPC insisted that petitioner enter into an agreement giving Corporate Management Consultant Services, Inc. (CMCS), another Florida corporation owned and operated by Georges, full control over petitioner's operations. CMCS began operating petitioner's business sometime during the period May 1, 1981, through May 5, 1981, and continued to do so until June 25, 1981. On June 25, 1981, the United States Department of Labor, Wage and Hour Division, requested the Postal Service to withhold funds owing to petitioner. The Postal Service paid petitioner every 28 days, for all services rendered up to the preceding Friday. The Department of Labor (DOL) took this withholding action to redress wage and hour violations petitioner had committed. Pursuant to DOL's request, the Postal Service withheld from petitioner $ 369,831.38, the remaining amount of funds due petitioner for services it had performed under its contracts. Petitioner ceased operations on Friday, June 26, 1981, and never operated again. [3] Thereafter, the Postal Service took bids from third parties on petitioner's mail-hauling contracts. After the loss of its contracts petitioner *281 had no means to repay its debts or to conduct any business activities. During 1981, before petitioner prepared its Federal income tax return for its taxable year ended June 30, 1981, the Federal Bureau of Investigation (FBI) seized petitioner's records. As a result of the FBI's investigation, the United States indicted Davis on mail fraud charges. Davis pled guilty in return for a reduced sentence. At the time of the FBI's seizure of the records, petitioner's records (bank statements, cancelled checks, invoices, etc.) were in "total disorder". No journals and ledgers had yet been prepared for the year. Petitioner did not maintain any contemporaneous books during the taxable year in issue (July 1, 1980 to June 30, 1981) and began the task of creating accounting journals and ledgers for that year after the release of its records in 1987. The record in this case does not explain why petitioner *282 failed to keep contemporaneous accounting books during its fiscal year ended June 30, 1981. Issue 1: Petitioner's Method of Accounting
For petitioner's taxable years ended June 30, 1978, June 30, 1979, and June 30, 1980, Reo M. Hood (Hood), a certified public accountant with over 15 years' experience, audited petitioner's books and prepared its financial statements and Federal corporate income tax returns. In calculating income for each of these years, Hood began with income received during the taxable year, subtracted the figure for the prior year's accounts receivable, and then added the figure for the current year's accounts receivable. In calculating expenses for each of these years, Hood began with expenses paid during the taxable year, subtracted the figure for the prior year's accounts payable, and then added the figure for the current year's accounts payable. Hood prepared petitioner's financial statements and Federal income tax returns pursuant to the accrual method of accounting during those years. As noted above, petitioner did not maintain any contemporaneous accounting books and ledgers during the taxable year in issue. Moreover, petitioner's Federal corporate *283 income tax return for the fiscal year ended June 30, 1981, was filed in 1983, approximately two years after the close of the taxable year, and was prepared without the benefit of petitioner's records, which were still in the custody of the FBI at that time. The gross receipts figure reflected on this return and the expenses were not the product of the accrual method of accounting. Hood prepared that return, but he merely wrote down figures supplied to him by Davis and his father (Jones E. Davis). After the FBI released petitioner's records in 1987, Hood began the task of creating journals and ledgers for petitioner's fiscal year ended June 30, 1981. At that time in 1987 Hood also prepared a statement of income and expenses for petitioner's 1981 taxable year. Hood generally followed the accrual method of accounting in preparing this statement. [4] Hood derived the income figure -- $ 10,797,602.49 -- primarily from bank deposits. [5]
*284 Issue 2: Whether petitioner's gross income for the taxable year properly includes $ 369,831.38 compensation the Postal Service withheld from petitioner at the direction of DOL; and whether petitioner may deduct this same amount. Petitioner first came to DOL's attention in 1978. Over the next few years petitioner would come under DOL's scrutiny for alleged wage and hour violations at least twice. On June 25, 1981, DOL's Wage and Hour Division requested the Postal Service to withhold funds owing to petitioner. DOL took this action to redress petitioner's violation of the minimum wage provisions of the Service Contract Act of 1956. Pursuant to DOL's request, the Postal Service withheld from petitioner $ 369,831.38, the remaining amount of funds due petitioner for services it had performed under its contracts. At that time DOL was claiming over $ 1,000,000 for petitioner's alleged violations. On July 28, 1987, the administrative law judge presiding over the Matter of United States Department of Labor v. Tony E. Davis, et al., Case No: 83-SCA-16, concluded that petitioner had violated the Service Contract Act of 1956 and certain regulations thereunder and owed the $ 369,831.38 *285 as back wages to its employees. Accordingly, the administrative law judge ordered the Postal Service to release to DOL the $ 369,831.38 to be distributed to petitioner's employees or to their personal representatives. Petitioner's gross income for its fiscal year ended June 30, 1981, amounted to at least the $ 10,797,602.49 figure determined by Hood, which figure included the $ 369,831.38 amount withheld at DOL's request. See supra note 5. While Hood had counted deposits into petitioner's 11 separate bank accounts in making his income computation, he did not include the Royal Trust bank account into which CMCS deposited petitioner's income in May and June of 1981. Petitioner's additional gross income for that period amounted to $ 1,089,000. Issue 3: Whether petitioner is entitled to reduce its gross income by $ 1,483,103.24, the amount of a loan petitioner allegedly received from George Schumann Tire and Battery Company. George Schumann Tire and Battery Company (Schumann Tire) was one of petitioner's suppliers up until CMCS took over petitioner's operations in May of 1981. Petitioner was a good customer and probably the largest customer of Schumann Tire. In computing *286 petitioner's gross income, Hood deducted from the bank deposits figure an amount of $ 1,483,103.24 as a loan from Schumann Tire. Hood had no personal knowledge as to either the fact or the amount of any such loan. Hood had not seen any loan documents or any checks reflecting the loan. Walter Williams, Schumann Tire's general manager, knew nothing about any such loan. Williams testified that Schumann Tire was not in the business of lending money. Davis conceded in his testimony that Schumann Tire never made a loan of $ 1,483,103.24 at any one time. The record in this case does not explain how that figure was determined. Davis testified he had an arrangement with a principal of Schumann Tire (Mr. Hart) whereby Hart would advance money some 7 or 8 days before the Postal Service's next payment was due, and when the Postal Service payment was received (every 28 days) by petitioner, the "advance" would be repaid without any interest. Mr. Hart did not appear or testify at the trial. The Court did not believe Davis' testimony about the alleged loan. The record does not establish that Schumann Tire made a loan to petitioner in the amount of $ 1,483,103.24 or in any other amount. *287 Issue 4: Whether petitioner is entitled to deduct certain expenses it incurred but did not pay during the taxable year. Petitioner claims deductible business expenses in the total amount of $ 10,611,663.66. Of that total amount it claims that an amount of $ 8,339,314.12 is substantiated by canceled checks. Respondent has agreed that $ 7,566,299.89 of these expenses are substantiated by canceled checks and represent deductible expenses. None of the canceled checks were produced at trial or offered in evidence. There is no probative evidence in the record to prove the additional amounts petitioner claims are substantiated by canceled checks. Of the total business expense amount ($ 10,611,663.66) petitioner claims, there are certain expenses that were incurred but not actually paid during its 1981 taxable year. Of the amount petitioner claims in this category, respondent has agreed that $ 1,402,088.60 of those expenses were incurred but not paid. [6]
*288 During the 1981 taxable year petitioner incurred but did not pay the following particular business expenses: Fuel
$ 642,059.80
Insurance
315,130.92
Miscellaneous
9,430.33
Office Expense
29,836.82
Rent Expense
2,091.40
Rental -- Tractor/Trailer
297,644.80
Repair and Maintenance
93,165.50
Road Expense
1,420.40
Telephone
11,308.63
There is no probative evidence in the record to substantiate any additional amount of these particular expenses (column 5 of Exhibit 36-Y) that petitioner claims were incurred but not paid that year. [7] Of the amount that respondent agreed was incurred but not paid, respondent objects to certain items as new issues raised for the first time at the trial. [8]
*289 Petitioner bought its 78 tractors and 114 trailers on credit both before and during the taxable year before the Court. Petitioner generally purchased the equipment under installment contracts, paying a certain percentage of the purchase price as a down payment and making monthly payments to reduce the balance financed by the seller. Petitioner paid $ 7,097.53 in interest on these contracts during the taxable year. However, interest may have continued to accrue on these installment contracts for some period in 1981. Petitioner claims additional interest of $ 457,415.12, presumably as accrued but unpaid during its fiscal year ended June 30, 1981. By March of 1981 petitioner's equipment was in very poor condition. Some of petitioner's tractors were wrecked and some had blown engines. Petitioner did not have enough tractors to operate its business. When Georges and CMCS took control of petitioner they initially operated with petitioner's equipment, but the delay in service caused CMCS so many problems that it grounded petitioner's vehicles and replaced them with newer vehicles while CMCS tried to maintain, trade, or repair the older vehicles. During this period CMCS used the *290 receipts from petitioner's mail contracts to pay petitioner's daily operating expenses. Gross receipts were sufficient to cover daily operating expenses. However, petitioner had a large amount of indebtedness, and its gross receipts were insufficient to cover the daily operating expenses and to service all of the indebtedness. On April 10, 1981, General Truck Equipment and Trailer Sales (GTETS) made a loan to petitioner in the amount of $ 25,000, bearing interest at the rate of $ 15.01 per day. Petitioner paid the interest through the end of April 1981. No payments of interest on this loan were made in May and June 1981. Interest in the total amount of $ 915.61 (61 days X $ 15.01 per day) accrued but remained unpaid on this loan during the year before the Court. Other than that amount, the record does not establish the amount of any interest that was accrued but unpaid during petitioner's fiscal year ended June 30, 1981. [9] During the taxable year petitioner paid bank service charges totaling $ 22,589.65, primarily for its checks that bounced. *291 When petitioner stopped operating on June 26, 1981, it left its equipment wherever the equipment happened to be at the time. However, petitioner did assist its various creditors to locate and repossess the equipment, and there is no evidence to suggest that petitioner intended to abandon its equipment. As noted above, petitioner at some time lost its mail-hauling contracts and had no way to pay its debts or to continue operations. Creditors seized petitioner's assets. Four tractors were repossessed before June 30, 1981, but most of its equipment was repossessed after the end of its taxable year. Claims against petitioner at the end of its 1981 fiscal year exceeded $ 1,000,000. The record does not establish the amount of its assets and liabilities as of June 30, 1981. Issue 5: Whether petitioner is entitled to deduct certain miscellaneous expenses it allegedly incurred and paid during the taxable year. a) "Coffee-Cokes" -- $ 1,256.77; Petitioner has not established that it incurred any expenses for coffee or cokes. While Hood testified that he arrived at the $ 1,256.77 figure by adding up certain canceled checks, petitioner never put the checks in evidence. *292 Hood stated to whom the checks were made out, but he had no personal knowledge of what the payments were for. There is no probative evidence to establish that this was a proper business expense of the corporation. b) "Salaries -- Trustee Account" -- $ 531,905.02; Petitioner had three categories of drivers: owner-operators, co-drivers, and employees. Owner-operators, or contract carriers as they are sometimes called, purchased their own tractors from petitioner, leased them back to petitioner for mail delivery, and provided driving services at a rate per mile. Petitioner treated these owner-operators as independent contractors. Some of the owner-operators worked with a second driver, or "co-driver". Petitioner had initially compensated the owner-operators in gross and had left it up to the owner-operators to pay their co-drivers' salaries. The owner-operators paid their co-drivers less than the minimum wages required under petitioner's contracts with the Postal Service, however, and DOL held petitioner liable for the difference. Petitioner had to remedy any violation, but it could not exercise direct control over the co-drivers' pay without calling into question the independent-contractor *293 status of the owner-operators. The co-drivers were neither employees nor independent contractors of petitioner, because they answered to the owner-operators; nonetheless petitioner was responsible under the Service Contract Act of 1956 for ensuring that they received the correct pay. As early as January 1980, petitioner had set up a trustee account at the Barnett Bank under the trusteeship of Lawhorn who managed and had sole authority over the account. Lawhorn was responsible for paying the co-drivers the wage rate required under the postal contracts. Petitioner's staff prepared a bank deposit and paychecks. On the morning of payday or on the day before payday, petitioner's staff would take the deposit to the bank and give the checks to Lawhorn. Lawhorn would review and sign the checks and then distribute them to the co-drivers. None of these trustee bank records were produced at trial or offered in evidence. There is no probative evidence in the record to establish the amount of any payments to co-drivers in the year before the Court or whether petitioner actually made any such payments that year. When Georges and CMCS began operating petitioner in May of 1981, they set *294 up a separate company, Chauffeur's Unlimited, to provide drivers for petitioner and thereby remove the threat of liability for wage and hour violations. Chauffeur's Unlimited paid the drivers and co-drivers for the period of time CMCS operated petitioner. [10]
Petitioner incurred expenses for co-drivers during prior taxable years. [11] There is no evidence in the record as to the amount of any such expenses incurred or paid during the fiscal year ended June 30, 1981. *295 c) "Tires & Tubes" -- $ 234,016.97; Petitioner purchased tires, batteries, recaps, and related services from Schumann Tire. Respondent agrees that petitioner paid $ 108,663.03 on its account with Schumann Tire during the year in issue. Although petitioner claimed that it had canceled checks showing the additional $ 234,016.97 claimed, those checks were not produced at the trial or offered in evidence. There is no direct evidence in the record to establish payments for tires and tubes in excess of the amount agreed to by respondent. However, there is some evidence to suggest that additional expenses for tires and tubes must have been incurred during that year. The amount of such additional expenses is approximately $ 131,337. [12]
*296 d) "Automobile Expenses" -- $ 17,325.00; Ray H. Fisher, a vice president of petitioner, was responsible both for ensuring that petitioner's equipment would be ready to make scheduled mail deliveries and for preparing DOT reports. Petitioner provided Fisher with a 1979 Pontiac Safari station wagon. Fisher used the station wagon to travel to the cities in which petitioner operated to investigate accidents and to attend court cases involving petitioner. Fisher's travel could last for several days at a time. Fisher was on call for nighttime repairs and drove the station wagon home at the end of the workday. Petitioner also provided cars for Davis, Davis' brother, and Davis' father and reimbursed two of its terminal managers for the expenses they incurred in operating their own automobiles in furtherance of petitioner's business. There is no evidence as to whether petitioner paid actual expenses or on a mileage basis. There is no persuasive evidence as to the number of miles that were driven for business purposes. There is no probative evidence to substantiate the amount of these expenses. There is no evidence upon which to base any estimate or approximation of the amount *297 of automobile expenses either paid or incurred during the taxable year before the Court. Issue 6: Whether petitioner is entitled under section 165 to deduct $ 330,513.05 for losses allegedly sustained on the repossession of its tractors. Petitioner's creditors repossessed four of its tractors during its taxable year ended June 30, 1981, and 43 of its tractors after the end of that taxable year. There is no probative evidence of either the fact of or the date of repossession of the remaining 31 tractors. For the four tractors repossessed during the taxable year before the Court, the installment contracts provided that upon petitioner's default the creditor could accelerate all unpaid installments and sell the tractors at public or private sale. The installment contracts required the creditor to apply the sale proceeds (less expenses of retaking, storing, repairing, and selling) to the outstanding balance and also obligated petitioner to pay any unpaid balance remaining thereafter. The following schedule presents the relevant financial information for determining petitioner's gain or loss on the four tractors repossessed during the taxable year and the character of said *298 gain or loss: Depreciation
Tractor
Date
Through
Serial No.
Purchased
Cost
8006
168981
07/01/79
$ 51,633.54
$ 17,866.25
169001
07/01/79
51,633.54
17,866.25
169002
07/01/79
51,633.54
17,866.25
105643
?    47,595.30
14,588.12
Sales Price
Blue Book
Depreciation
Date of
After
Avg Retail
Blue Book
8106
Repossession
Repossession
6/30/81
Avg Finance
$ 11,410.00
6/11/81
$ 18,423.97
$ 33,131.24
$ 25,925
11,410.00
6/22/81
18,423.97
33,131.24
25,925
11,410.00
6/15/81
18,590.35
33,131.24
25,925
9,430.62
6/18/81
14,915.48
35,743.75
27,925
The record does not indicate when the sales of these four repossessed tractors took place. Issue 7: Whether petitioner is entitled under section 166 to deduct $ 1,785,064.74 in alleged bad debts owing to petitioner from the owner-operators. As noted above, the owner-operators purchased tractors from petitioner and leased them back to petitioner for mail delivery. Petitioner maintained an account of the outstanding balance owner-operators owed petitioner for the purchase of their trucks. The outstanding balance due from the owner-operators as of the end of the fiscal *299 year ending June 30, 1980, was $ 1,785,064.74. The record does not establish the outstanding balance of this account at the end of the taxable year in issue. [13] There is no probative evidence in the record to establish either the fact of or the amount of any bad debt in regard to the owner-operators. *300 Issue 8: Whether petitioner is entitled under section 165 to deduct $ 639,811.81 in losses from judgments petitioner's creditors allegedly obtained against petitioner. Because petitioner's equipment sold for less than the outstanding amounts petitioner owed under purchase contracts, three of petitioner's creditors sued petitioner for deficiency judgments. The record is devoid of any probative evidence as to either the timing or the amount of any judgments petitioner's creditors, in fact, obtained against petitioner. However, any such judgments would have had to have been obtained subsequent to the taxable year before the Court. OPINION Issue 1: Petitioner's Method of Accounting
Section 446(a) allows a taxpayer to compute its taxable income under the method of accounting it regularly uses to compute its income in keeping its books. Where the taxpayer does not regularly use a method of accounting or if the method used does not clearly reflect income, section 446(b) permits the Secretary to recompute the taxpayer's income under such accounting method as, in the opinion of the Secretary, will clearly reflect income. Respondent observes that petitioner kept no contemporaneous *301 accounting books or ledgers during the taxable year before the Court, and argues therefore that petitioner had no regular method of accounting. Respondent concludes that, in the absence of a regular method of accounting, she was entitled to utilize the cash method to recompute petitioner's income. Respondent does not suggest that the accrual method of accounting would not clearly reflect petitioner's income. Petitioner counters that it used the accrual method to compute its income in the 3 previous taxable years and that the accrual method was its regular method of accounting. Petitioner concludes that it is entitled to use the accrual method to compute its income. Petitioner utilized accounts receivable and accounts payable for each of the fiscal years ending June 30, 1978, 1979, and 1980; and in determining its income for any given year petitioner started with cash received or paid, backed out the previous year's receivables and payables, and added in the current year's receivables and payables. We have found, based on Hood's testimony and petitioner's financial statements and tax returns for these years, that petitioner consistently used the accrual method of accounting to *302 compute its income in these prior years. [14] See Consolidated Tea Co. v. Bowers, 19 F.2d 382 (S.D. N.Y. 1927). Nonetheless, petitioner did not maintain contemporaneous books of account during the taxable *303 year before the Court, and before it prepared its tax return for that year the FBI seized its records. Petitioner reported its Federal corporate income tax without the benefit of its records, and the gross receipts and expense figures reported on that return were not computed using the accrual method. In fact the record does not show the source or basis for any of the figures on that return. While Hood physically prepared that return, he candidly admitted that he merely wrote down figures that Davis and his father (Jones E. Davis) gave to him. Without adverting to the evidence of petitioner's history of consistent accrual reporting, respondent argues that petitioner's failure to keep any contemporaneous books of account during the taxable year ended June 30, 1981, permits her to place petitioner on the cash method. Respondent cites Kotmair v. Commissioner, 86 T.C. 1253 (1986), and England v. Commissioner, 34 T.C. 617 (1960), in support of this proposition. The individual taxpayers in those cases kept no books of account for the taxable years involved therein, and the Court approved respondent's recomputation of the taxpayers' income under *304 the cash method. However, in neither case did the Court make findings concerning the taxpayer's accounting method or bookkeeping practices in prior years. Those cases are factually distinguishable from the case before us, since petitioner, unlike those taxpayers, consistently computed its income on the accrual method in prior years for both tax reporting purposes and year-end financial reporting purposes. Neither Kotmair nor England expressly articulates why the taxpayer's failure to maintain books of account necessitates a finding that the taxpayer was on the cash, rather than the accrual, method. But see Brander v. Commissioner, 3 B.T.A. 231 (1925). In Brander, as in Kotmair, England, and the instant case, the taxpayer kept no books of account during the taxable year in issue; moreover, in Brander, as in Kotmair and England, there is no discussion of the taxpayer's accounting practices in previous years. However, in Brander, the taxpayer himself had reported his income on the accrual basis, and during the audit of his return tried to change to the cash basis, while respondent sought to hold the taxpayer to the accrual *305 basis. On the question of the taxpayer's accounting method the Board said: There is no foundation in this record upon which it can be said that the method of accounting regularly employed in keeping the taxpayer's books of account is the accrual method. He had no method of accounting, for he kept no books, and, except in an extraordinary case, which does not now come to mind, an accrual method without accounting records is an anomaly. Such a method is inherently an accounting system whereby one is enabled not merely to record receipts and payments after they take place but to keep track of his financial rights and obligations under a credit system. Even a simple practice of accruals would require systematic accounting and some sort of bookkeeping. Without records it may generally be concluded that the cash method is being used. * * *
Brander v. Commissioner, supra at 235. In Brander, the Board concluded the taxpayer could use the cash method, [15] and in doing so focused on the contemporaneous nature of an accrual accounting system. *306 Without contemporaneity a fact finder could logically infer that the taxpayer was using the cash method. Noncontemporaneous accounting records would defeat the utility of the accrual method for financial accounting purposes: if the taxpayer does not make entries in its books at or near the time of the underlying transactions represented by those entries, the taxpayer cannot keep track of its rights and obligations in real time under a credit system. A reasonable taxpayer would be unlikely to use the accrual method of financial accounting and at the same time fail to keep contemporaneous books. Thus, the absence of contemporaneity in bookkeeping tends to support an inference that the taxpayer was not on the accrual method of accounting for the taxable year in issue, since without contemporaneous bookkeeping the taxpayer has defeated the utility of accrual accounting, at least from a financial accounting standpoint. However, while financial accounting strives to give the business person financial information in real time, tax accounting is generally intended to give revenue collectors financial information on an annual (as opposed to a quarterly, monthly, weekly, etc.) basis, and *307 contemporaneity is not necessarily required to determine the taxpayer's annual tax liability on the accrual method. Hood's testimony, coupled with petitioner's financial statements and corporate income tax returns, satisfies us that petitioner followed the accrual method for tax accounting purposes in each of the three years preceding the taxable year in issue. Moreover, the fact that the books for fiscal 1981 were not based on contemporaneous entry does not, in itself, disqualify them as books of accrual accounting. While contemporaneous entry may well be a requirement of day-to-day financial management, it is not always essential to accounting for profit or loss at the end of the tax year. This Court has previously recognized that contemporaneous entry is not always a prerequisite for recognition of a system of accrual accounting. Atlanta & Charlotte Air Line Railway Co. v. Commissioner, 36 B.T.A. 558 (1937). However, contemporaneity generally gives a taxpayer's books greater probative value in establishing the truth of the matter contained therein. The reconstruction of books in Atlanta & Charlotte Air Line Railway Co. v. Commissioner involved just *308 a few entries, whereas the instant case involves reconstruction of a full year's day-to-day operations of an active business. Of course a year-end reconstruction of accrual accounting records will not necessarily be deemed as trustworthy as a regularly kept set of books in which accrual and book entry occur at or about the same time. The business-records exception to the hearsay rule requires that such records be "kept in the course of a regularly conducted business activity, and * * * [that] it was the regular practice of that business activity" to keep such records. Fed. R. Evid. 803(6). For reasons not disclosed in the record of this case, no accounting books and ledgers were maintained during petitioner's fiscal year ended June 30, 1981. During the audit stage petitioner's underlying records were still in the possession of the FBI and were still not available to petitioner or to respondent. After the petition was filed in this Court, petitioner's records were returned to it, and Hood set about creating the accounting books and ledgers for petitioner's fiscal year ended June 30, 1981. Accordingly, it is appropriate that these reconstructed accrual records should be subjected *309 to somewhat closer scrutiny than would be the case for accrual accounting records regularly and contemporaneously maintained in the normal course of the conduct of the business. [16]
Nonetheless, to shift petitioner to the cash method from its prior consistent use of the accrual method for both financial and tax reporting purposes would not clearly reflect petitioner's income for the taxable year in issue. [17] Under the circumstances of this case, we *310 hold that petitioner is entitled to have its income and resulting tax liability for fiscal 1981 determined under the accrual method of accounting. Issue 2: Whether petitioner's gross income for the taxable year properly includes $ 369,831.38 compensation the Postal Service withheld from petitioner at the direction of the Department of Labor (DOL); and whether petitioner may deduct this same amount. On June 25, 1981, in order to redress a violation of the minimum wage provisions of the Service Contract Act of *311 1956, DOL requested the Postal Service to withhold $ 369,831.38, the balance owing to petitioner for services rendered under its mail-hauling contracts. At that time DOL's claims against petitioner exceeded $ 1,000,000. The Postal Service complied with DOL's request. On July 28, 1987, an administrative law judge presiding over the Matter of United States Department of Labor v. Tony E. Davis, et al., Case No: 83-SCA-16, concluded that petitioner had violated the Service Contract Act of 1956 and certain regulations thereunder and owed the $ 369,831.38 as back wages to its employees. Accordingly, the administrative law judge ordered the Postal Service to release to DOL the $ 369,831.38 to be distributed to petitioner's employees or to their personal representatives. Neither party advances a consistent or principled argument on this issue. Respondent argues that under either the cash or the accrual method, petitioner should not report as income the $ 369,831.38 the Postal Service withheld and that petitioner is not entitled to deduct the same amount, because the funds were never petitioner's to report or to pay out. Petitioner ignores respondent's apparent concession and argues *312 that under the accrual method it is taxable on the $ 369,831.38 compensation it never received from the Postal Service but that it is entitled to deduct the same amount during the year in issue, even though the Postal Service withheld the funds from petitioner in 1981 and did not release them [to DOL] until sometime presumably in 1987. Petitioner has taken the position that it is an accrual method taxpayer and recognizes that it must accrue items of both income and expense. We have found that petitioner is entitled to use the accrual method, and under that method we think all events had occurred for accrual of the income. Petitioner had rendered the services and earned the income; the Postal Service was prepared to pay petitioner, but held up payment at the request of a creditor, DOL. Even under the cash-basis method of accounting, petitioner might well be considered as having constructively received the payment the same as a wage-earner whose wages are garnisheed by a creditor. On the other hand, petitioner apparently was contesting DOL's right to the funds, so petitioner's liability for such wage payments could hardly be deemed to be accrued until that contest was resolved *313 in 1987. United States v. Consolidated Edison Co. of New York, 366 U.S. 380 (1961). Notwithstanding our misgivings about respondent's position -- that petitioner should not report as income the $ 369,831.38 the Postal Service withheld from it -- we accept it as a concession. Such a concession renders moot the issue of the deductibility of the identical amount. Issue 3: Whether petitioner is entitled to reduce its gross income by $ 1,483,103.24, the amount of a loan petitioner allegedly received from George Schumann Tire and Battery Company. As shown in the Findings of Fact above, the record does not establish that Schumann Tire made a loan to petitioner in the amount of $ 1,483,103.24 or in any other amount. Petitioner suggests that respondent somehow bears the burden of proof on this issue because respondent has allegedly asserted an increased deficiency. However, the pleadings have never been amended to assert any increased deficiency in this case. The amount of any deficiency computed under Rule 155 is not to exceed the $ 328,549 figure determined in the statutory notice of deficiency. Issue 4: Whether petitioner is entitled to deduct expenses *314 it incurred but did not pay during the taxable year. Putting aside interest expenses for the moment, we note that the parties have agreed that petitioner incurred but did not pay business expenses in the total amount of $ 1,402,088.60 during its fiscal year ended June 30, 1981. Respondent argues that these expenses are not deductible because petitioner is or should be treated as a cash-basis taxpayer. We have concluded that petitioner is entitled to use the accrual accounting method. Respondent also argues that certain of these business-expense items were untimely raised, an argument we have also rejected. See supra note 8. That brings us to respondent's principal argument for nondeductibility of these incurred but unpaid expenses. Lumping together business expenses and interest expenses and relying on a certain line of cases in this Court involving interest deductions, respondent argues that an accrual-method taxpayer cannot deduct such accrued but unpaid expenses if there is no reasonable expectation that such expenses will ever be paid. We perceive both factual and legal difficulties in respondent's approach, which will be discussed below. Broadly speaking, what *315 respondent is suggesting would mean that a failing accrual-basis business would have all of its accrued but unpaid expenses disallowed in what turns out to be its last year of business operations, with the result that whatever income it received or accrued would be taxable without any offset for the expenses that were incurred in earning that income. Not only does respondent's approach not clearly reflect income, it serves to artificially create taxable income for a failing business. For the reasons discussed below, we reject that approach under the facts and circumstances of this case. a) Interest Deductions
Section 163(a) allows a deduction for all interest paid or accrued on indebtedness during the taxable year. Pursuant to section 461(a), the method of accounting the taxpayer uses to compute taxable income determines the proper taxable year for taking any deduction. Under the accrual method of accounting, the deduction is taken in the taxable year "in which all the events have occurred which determine the fact of the liability and [in which] the amount thereof can be determined with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs.
Petitioner claims interest *316 deductions in the total amount of $ 464,512.65. Of that amount petitioner actually paid $ 7,097.53. Respondent agrees that there are canceled checks substantiating interest payments of $ 7,097.53, and respondent has not suggested that such payments represented payment of prior year accruals. Thus respondent concedes petitioner is entitled to deduct the $ 7,097.53. Presumably petitioner contends that the balance of $ 457,415.12 represents interest which it incurred, and which, under the all-events test of accrual accounting, should be treated as accrued, but unpaid, for the year. Respondent argues that petitioner has failed to establish any additional amount of interest paid or accrued. Petitioner asks the Court to make an estimate or approximation under the Cohan rule. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Petitioner owned 78 tractors and 114 trailers during the taxable year, which it had purchased on credit both during and before the taxable year. The purchase contracts called for installment payments, including interest. Petitioner was also indebted on a loan GTETS made to petitioner on April 10, 1981, in the amount of $ 25,000, bearing *317 interest at the rate of $ 15.01 per day. Davis testified that petitioner made installment payments on its equipment during the taxable year. A GTETS representative testified that petitioner made some payments on its indebtedness to GTETS but that during the period of time CMCS was operating petitioner (from the beginning of May through the end of June 1981) petitioner stopped making those payments. The testimony of both witnesses was rather vague. However, the GTETS contract is in evidence, and we have found that an additional $ 915.61 in interest accrued on that indebtedness for the final two months of the fiscal year. Eleven purchase contracts for purchase of 11 tractors are in evidence and reflect interest provisions. However, it is not possible to determine whether the interest payments or accruals under those 11 contracts are in addition to, or are included within, the $ 7,097.53 interest payments stipulated by the parties. See supra note 9. There is no other evidence in the record on which the Court can base any estimate or approximation of any additional payments or accruals of interest. Even under the Cohan rule, there must be some minimal factual basis for *318 making an estimate or approximation. The Court must first be satisfied that some additional amount beyond the $ 7,097.53 payments and the $ 915.61 accrual was paid or accrued. The Court is not. Thus, any estimate or approximation here would amount to sheer "unguided largesse". Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). See also Mayrath v. Commissioner, 357 F.2d 209, 214-215 (5th Cir. 1966), affg. 41 T.C. 582 (1964); Stein v. Commissioner, 322 F.2d 78, 83 (5th Cir. 1963), affg. T.C. Memo. 1962-19; Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Moreover, the Cohan rule should not be applied where the claimed but unsubstantiated deductions are of the sort for which the taxpayer could and should have maintained and produced the necessary records. Lerch v. Commissioner, 877 F.2d 624, 627-629 (7th Cir. 1989), affg. T.C. Memo. 1987-295. [18]
*319 Accordingly, we hold that petitioner has not proved payment or accrual of interest in excess of the $ 7,097.53 payment and the $ 915.61 accrual of interest owing to GTETS. This interest accrual, however, presents the Court with respondent's primary contention that accrued interest is not deductible if there is no reasonable expectation that it will ever be paid. The case authority on this issue is both limited and sharply divided. In Panhandle Refining Co. v. Commissioner, 45 B.T.A. 651 (1941), the predecessor to this Court allowed the deduction of interest accruals where there was a possibility but not a certainty that the interest would never be paid. Later that year the Board upheld the Commissioner's disallowance of interest accruals in Zimmerman Steel Co. v. Commissioner, 45 B.T.A. 1041, 1046-1047 (1941), revd. 130 F.2d 1011 (8th Cir. 1942), where "there was no reasonable expectation of such obligation being discharged in the normal course of business." Zimmerman Steel Co. was, however, reversed by the United States Court of Appeals for the Eighth Circuit, with the following holding: The law is that if a method *320 of bookkeeping employed by a taxpayer "does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income" (Section 41), and the real facts, not forms of entry, must measure the tax. But where interest actually accrues on a debt of a taxpayer in a tax year the statute plainly says he may deduct it. That he has no intention or expectation of paying it, but must go into bankruptcy as this taxpayer was obliged to do, can not of itself justify denial of deduction in computing taxpayer's net income. * * *
Zimmerman Steel Co. v. Commissioner, 130 F.2d 1011, 1012 (8th Cir. 1942). Despite the Eighth Circuit's reversal, the Tax Court foreshadowed its adherence to the Zimmerman Steel Co. opinion in Pearlman v. Commissioner, 4 T.C. 34 (1944), affd. 153 F.2d 560 (3d Cir. 1946). Pearlman is a transferee liability case in which the taxpayer's husband reported his personal indebtedness on the books of his inactive business. The business' books were kept on an accrual basis for financial accounting purposes, but taxpayer's *321 husband was a cash-method taxpayer. The Court disregarded the inactive business and held that the taxpayer's husband could not deduct the interest until he paid it. In dictum the Court indicated that it would continue to adhere to the position it had taken in Zimmerman Steel Co., and observed that even if the business had been active, it was arguable that it would not have been entitled to deduct the interest accruals. Pearlman v. Commissioner, supra at 54. The Tax Court adhered to Zimmerman Steel Co. in Brainard v. Commissioner, 7 T.C. 1180 (1946), decision vacated per parties' stipulation     F.2d     (7th Cir., June 27, 1947),     AFTR    , 47-2 USTC par. 9306. In upholding the disallowance of the taxpayer's interest deductions, the Court wrote: Petitioner's financial condition as to both assets and earnings, and the entire history of the transaction as it is revealed by the record, disclose the extreme improbability that the payments in question would ever be made. If we are empowered to consider the settlement with creditors made several years later, it reinforces the conclusion, since *322 the amount finally received by them was not sufficient and was not intended to discharge the interest or in fact more than a small fraction of the principal. If not, there is at least nothing to impair it. Since we have found that there was no likelihood that the items accrued would ever be paid, it follows that, on the authority of Zimmerman Steel Co., supra, the deficiency should to that extent be approved. [Citations omitted.]
Brainard v. Commissioner, 7 T.C. at 1184. Cases decided in this Court since Brainard have generally fallen short of finding that the interest accruals involved would never be paid. [19] The Court has, however, continued to indicate its adherence to the view expressed in Zimmerman Steel Co. v. Commissioner, supra, and Brainard v. Commissioner, supra.[20]
*323 The second line of authority on this issue is of particular significance because any appeal in this case will lie to the United States Court of Appeals for the Eleventh Circuit. Under the authority of Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. on other grounds 445 F.2d 985 (10th Cir. 1971), this Court will follow any controlling legal precedent of the Eleventh Circuit. The Eleventh Circuit follows as precedent those cases decided by the Fifth Circuit prior to the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981). The Fifth Circuit, in Fahs v. Martin, 224 F.2d 387 (5th Cir. 1955), faced the issue at bar, and upheld the deductibility of interest accruals despite the improbability of payment. In holding that the taxpayer was entitled to deduct the interest accruals despite the slim chances that the interest accruals would ever be paid, the Fifth Circuit relied, in large part, on the Eighth Circuit's Zimmerman Steel Co. opinion. Fahs v. Martin, supra at 393. In Mooney Aircraft, Inc. v. United States, 420 F.2d 400 (5th Cir. 1969), *324 the Fifth Circuit appeared to cast some doubt on its earlier position. In that case the taxpayer gave with the sale of each of its airplanes a $ 1,000 "bond" redeemable only upon permanent retirement of the plane from service. The taxpayer sought to deduct expense accruals in the amount of the face value of each "Mooney Bond" in the year it was issued, and the District Court upheld the Commissioner's disallowance of such deductions. The Fifth Circuit expressly found that the expense accruals met the "all events" test, id. at 405-409, but nonetheless denied the deductions. The Fifth Circuit concluded that the length of time -- as much as 30 years -- between incurrence of the liability and eventual payment of the obligation compelled the disallowance, both because it completely mismatched any relationship between income and expenditure and thus distorted rather than reflected income, and because it made eventual payment of the liability improbable. Id. at 409-410. In reaching this conclusion the Fifth Circuit also pointed out: Some courts have held that the improbability of payment is not a ground for disallowing the accrual of a future *325 expense. [Id. at 410; fn. ref. omitted.]
The Fifth Circuit noted that the Eighth Circuit's Zimmerman Steel rule was a "rather dubious rule of tax accounting", especially in light of the subsequent cases of Schlude v. Commissioner372 U.S. 128 (1963), and American Automobile Association v. United States, 367 U.S. 687 (1961). Mooney Aircraft, Inc. v. United States, supra at 410 n. 38. However, in the subsequent case of Tampa & Gulf Coast Railroad Co. v. Commissioner, 469 F.2d 263, 264 (5th Cir. 1972), affg. 56 T.C. 1393 (1971), the Fifth Circuit indicated, although in dictum, the continuing vitality of its Fahs v. Martin holding. Although in Tampa & Gulf Coast the Fifth Circuit declined to follow Fahs v. Martin, supra, it stated that the principle espoused therein -- an accrual-method taxpayer's inability to pay interest obligations does not prevent deductibility -- gave away to the "extreme circumstances" in Tampa & Gulf Coast. The "extreme circumstances" the Fifth Circuit spoke of were factors heavily suggesting *326 a lack of bona fide indebtedness, the basis for the Tax Court's disallowance of the interest accruals below. Tampa & Gulf Coast Railroad Co. v. Commissioner, 56 T.C. at 1400-1403. In the Fifth Circuit, and presumably in the Eleventh Circuit also, the rule is that improbability of payment does not preclude accrual and deduction. Under the Golsen rule we would defer to that controlling legal precedent. However, even under our own Zimmerman Steel Co. and Brainard holdings, there are good reasons for permitting deduction of the interest accruals here and particularly for permitting accrual and deduction of the business expenses. First, there is some doubt as to the factual predicate for improbability of payment as of the end of petitioner's taxable year, June 30, 1981. As matters turned out, we now know that petitioner lost its mail-hauling contracts and never resumed operations. However, it is doubtful that that was reasonably known or knowable as of June 30, 1981. On that date, petitioner's operations had been suspended only since the preceding Friday, June 26, 1981. While DOL had a claim of $ 1,000,000 against petitioner for purported wage violations *327 and there were unpaid expenses already incurred in excess of another $ 1,000,000, the record does not establish the amount of petitioner's total assets or total liabilities. Also petitioner was an active, operating business up until June 26, 1981, and the Court is unwilling to assume that as of June 30, 1981, there was a certainty or even a strong probability that petitioner's accrued interest and business expenses would never be paid. Thus, on this record, the Court would be unwilling to extend the rationale of Zimmerman Steel Co. and Brainard to this case. That is particularly true as to the incurred business expenses. b) Business Expenses
Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. The parties have stipulated that petitioner incurred but did not pay business expenses in the total amount of $ 1,402,088.60. Here again respondent opposes the deductions sought for these expenses on the ground that there is no likelihood that these expenses will ever be paid. Even if it be assumed that inability to pay justifies denial of deductions for properly accrued *328 interest expense, it does not automatically follow that the Zimmerman Steel Co. and Brainard reasoning justifies denial of deductions for operating expenses of the type under consideration here. It is fundamental in accrual accounting that every effort be made to match expenses to the income generated by those expenses so that the year-end accounting accurately reflects the year's true net income from the business. Denial of an interest expense deduction certainly affects the overall financial picture, but does not violate the matching of income and expense in the same way as does denial of a deduction of an operating expense related to the production of income. Interest is the price paid for the use or forbearance of money, but the loan itself is not a receipt of income. Thus, since the principal of the loan is never included in income in the first place, it makes sense when there is no possibility of repayment of the principal or the interest thereon to disallow further deductions for interest accruals. However, here the income from the mail-hauling contracts is known, has been reported in income, and is taxable. To deny deductions for expenses actually incurred, though *329 not yet paid, to generate that income would distort petitioner's income rather than clearly reflect it. Income produced by mail-hauling services is directly related to the expenses incurred in producing that income. To deny the deductions for these expense accruals would result in the paradox of creating highly artificial taxable net income at the very time the accrual-basis business is failing. In the context of this case, the integrity of a system of accrual tax accounting does not call for denying deductions for these valid business expense accruals whether or not there is a reasonable expectation that petitioner will pay them. On this record, there are questions as to the factual predicate for application of the rule of our Zimmerman Steel Co. v. Commissioner, 45 B.T.A. 1041 (1941), and Brainard v. Commissioner, 7 T.C. 1180 (1946). Also on the facts of this case, we are unwilling to extend that rule so as to deny deductions for otherwise properly accrued business expenses. Accordingly, we hold that petitioner may deduct its interest payments and accruals and may also deduct its incurred, but unpaid, business expenses. Issue 5: *330 Whether petitioner is entitled to deduct miscellaneous expenses it allegedly accrued and paid during the taxable year. a) "Coffee-Cokes" -- $ 1,256.77; Petitioner failed to provide any probative evidence to substantiate this expenditure. b) "Salaries -- Trustee Account" -- $ 531,905.02; There is no probative evidence in the record to establish the amount of any payments to co-drivers in the year before the Court or whether petitioner actually made any such payments that year. c) "Tires and Tubes" -- $ 234,016.97; The record establishes that petitioner purchased tires, batteries, recaps and related services from Schumann Tire. For the reasons stated in the Findings of Fact, we have concluded that petitioner had accrued expenses in the amount of $ 131,337 in addition to the $ 108,663.03 stipulated by respondent. See supra note 12. d) "Automobile Expenses" -- $ 17,325.00; Davis testified that petitioner provided him, his brother, his father, and Fisher with automobiles, and that petitioner reimbursed two of its terminal managers for the expenses they incurred in operating their own automobiles in furtherance of petitioner's business. Davis' testimony *331 is uncorroborated, except with respect to the car provided to Fisher. However in her brief in answer respondent does not object to petitioner's requested finding that it incurred expenses in the operation of several automobiles. Nonetheless, petitioner has provided no records whatsoever to substantiate the amount of this expense. More importantly, the Court cannot determine whether these automobile expenses are already included in one of the other categories of expenses such as salaries. Accordingly, we decline petitioner's invitation to apply Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Stein v. Commissioner, 322 F.2d 78 (5th Cir. 1963), affg. T.C. Memo. 1962-19. See also Lerch v. Commissioner, 877 F.2d 624 (7th Cir. 1989), affg. T.C. Memo. 1987-295. Issue 6: Whether petitioner is entitled under section 165 to deduct $ 330,513.05 for losses allegedly sustained on the repossession of its tractors. Section 165 allows a taxpayer to deduct any uncompensated losses sustained during the taxable year. Petitioner's creditors repossessed four of its tractors during the taxable *332 year and 43 of its tractors after the end of the taxable year. The record is silent as to when or indeed whether the rest of the equipment was repossessed. Respondent argues that under section 165 petitioner is not entitled to a deduction in its fiscal year ending June 30, 1981, for losses from foreclosure sales occurring after year-end. Respondent contends that petitioner has failed to prove when any of the equipment was sold and notes the likelihood that even the four tractors repossessed before year-end were sold after year-end. From this respondent concludes that any repossession loss would not be deductible in the taxable year in issue. We agree. However, respondent's depreciation recapture theory appears on its face to conflict with her theory as to the proper year to report the losses. See supra note 1. Shifting the focus next to section 1245, respondent argues that petitioner abandoned its assets when it ceased operations in June of 1981. Under section 1245 the amount of depreciation recapture may differ, depending on whether the asset is disposed of in either a sale, exchange, or involuntary conversion (recapture measured by difference between adjusted *333 basis and lesser of recomputed basis or fair market value). Under respondent's theory, petitioner's abandonment of its assets forces it to recapture depreciation, because abandonment is neither sale, exchange, nor involuntary conversion; and instead of measuring recapture using the amount realized in the foreclosure sales (relatively small amounts apparently), petitioner must, respondent argues, measure recapture using the equipment's fair market value (alleged to be relatively large amounts). Respondent fails to mention, however, that the proper taxable year to report the losses under section 165 may depend on whether they arose from an abandonment or, rather, from repossession. There is a question as to whether a disposition (repossession) that constitutes a sale for purposes of sections 1001 and 165 can simultaneously constitute an abandonment for purposes of section 1245. The answer, at least in this Court, is "no". Estate of Delman v. Commissioner, 73 T.C. 15, 36-37 (1979). Another question is whether a disposition that results in a loss for purposes of sections 1001 and 165 can give rise to recapture under section 1245. The answer to this question *334 is also "no". Sec. 1.1245-1(d), Income Tax Regs. Accordingly, we are not certain whether respondent intended to argue that petitioner disposed of its assets through repossession or through abandonment. As petitioner observes, however, the statutory notice of deficiency discusses repossession, not abandonment. Moreover, respondent's pleadings and trial memorandum give no hint of respondent's abandonment theory. Interjection of this argument into the controversy for the first time on brief would prejudice petitioner in its ability to put on evidence. Accordingly, we will hold respondent to her repossession theory. See Ware v. Commissioner, 92 T.C. 1267, 1268-1269 (1989), affd. 906 F.2d 62 (2d Cir. 1990). Moreover, the facts do not suggest that petitioner had any intent to abandon its equipment. Regarding the proper taxable year to report the income or loss from the equipment repossessions, petitioner cites Commissioner v. Highway Trailer Co., 72 F.2d 913 (7th Cir. 1934), revg. 28 B.T.A. 792 (1933), and argues that it is entitled to deduct all of its repossession losses in the taxable year in issue. In *335 Highway Trailer Co., however, the Seventh Circuit expressly distinguished cases involving physical damage (taxpayer sustained losses from a fire in Highway Trailer Co.) from cases in which the claimed loss arises from a liability which never may materialize. Id. at 915. Since the present case does not involve physical damage but instead involves liabilities arising from repossession and foreclosure of petitioner's equipment, the present case is distinguishable on its facts from Highway Trailer Co.
We agree with respondent that the dates of the foreclosure sales establish the proper taxable year to report the losses. Foreclosure sales conclusively establish the value of the repossessed property and, thus, definitively establish the taxpayer's loss. Helvering v. Hammel311 U.S. 504, 512 (1941); Eisenberg v. Commissioner, 78 T.C. 336, 344 (1982). This proposition holds true regardless of whether the property is real or personal. Helvering v. Hammel, supra at 512; Eisenberg v. Commissioner, supra at 344. Accordingly, petitioner, an accrual-basis taxpayer, must deduct any losses *336 sustained on the questioned repossessions in the taxable years in which the foreclosure sales occurred. As respondent correctly observes, however, petitioner has provided the Court with no proof of the dates of the foreclosure sales, and it does seem likely that the few tractors repossessed before the end of the taxable year in issue were not sold until after year-end. Thus, petitioner has not met its burden of proving the deductibility of any of the alleged repossession losses. [21]
*337 Issue 7: Whether petitioner is entitled under section 166 to deduct $ 1,785,064.74 in alleged bad debts owing to petitioner from the owner-operators. Section 166(a) allows a taxpayer to deduct debts that become worthless in whole or in part within the taxable year. Section 166(b) provides that the basis for determining the amount of the deduction is the adjusted basis under section 1011 for determining the loss from the sale or other disposition of property. Petitioner bears the burden of proving its entitlement to the section 166 bad debt deduction. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioner has provided us with no probative evidence to prove that its equipment accounts receivable ever became worthless and certainly has not proven that the equipment accounts receivable became worthless during the taxable year in issue. This failure of proof is fatal to petitioner's claim. Accordingly, petitioner is not entitled to any portion of the section 166 deduction it claims. Issue 8: Whether petitioner is entitled under section 165 to deduct $ 639,811.81 in losses from judgments its creditors allegedly obtained against it.
*338 As noted above, section 165 allows a taxpayer to deduct any uncompensated losses sustained during the taxable year. Here, petitioner cites In re Barry, 48 Bankr. 600 (Bankr. M.D. Tenn. 1985), which, in turn, cites Helvering v. Hammel, supra, and argues that it is entitled to deduct in its fiscal year ending June 30, 1981, judgments obtained against it by its creditors, because the equipment repossessions and foreclosure sales occurred before the end of the fiscal year. Petitioner failed to prove that any of the equipment foreclosure sales occurred before the end of the taxable year in issue. Moreover, petitioner simply has not provided the Court with even a shred of evidence of either the timing of or the amount of any judgments its creditors allegedly obtained against it. Accordingly, petitioner is not entitled to deduct any portion of the amount it claims for judgment losses. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Respondent determined additional tax in the amount of $ 175,211 for investment tax credit recapture resulting from the repossession of petitioner's equipment. Petitioner expressly conceded the issue on brief. Moreover, respondent says this issue was not raised in the petition or amended petition and therefore would be deemed to be conceded. Rule 34(b)(4). Petitioner had to concede the issue because of its position that its tractors and trailers were in fact repossessed during the year before the Court; respondent agrees with petitioner because of her argument that petitioner disposed of the tractors and trailers by abandonment during that year. However, as indicated below the facts are otherwise, and this "concession" is essentially a legal conclusion which the Court is free to disregard. Rose Ann Coates Trust v. Commissioner, 55 T.C. 501, 511 (1970), affd. 480 F.2d 468 (9th Cir. 1973). See infra↩ Issue 6 and particularly note 21. 2. On brief petitioner raises an additional issue: whether it is entitled under sec. 165 to deduct $ 161,657.54 for losses allegedly sustained on the repossession of improvements to its trailers. The pleadings do not foreshadow this issue, and its interjection into the controversy for the first time on brief would unfairly prejudice respondent in her ability to put on evidence. Accordingly, we will not consider this issue. See, Ware v. Commissioner, 92 T.C. 1267, 1268-1269 (1989), affd. 906 F.2d 62 (2d Cir. 1990). Moreover, there is no evidence in the record to establish the fact or amount of any such loss. Petitioner essentially relies upon figures in the prior years' tax returns. However, tax returns are merely a statement of a taxpayer's claim and do not establish the truth of facts stated therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051↩ (1957).
3. The record does not establish the present legal status of petitioner; presumably it is still in existence but inactive.↩
4. However, the four loss figures at the bottom of this statement (Exhibit 8) were not determined by Hood, but are simply figures given to him by Davis or his father (Jones E. Davis). ↩
5. More specifically, Hood testified that he arrived at the $ 10,797,602.49 figure by starting with total deposits ($ 13,809,941.86), adjusting for interaccount transfers ($ 1,256,664.92), backing out a loan ($ 1,483,103.24), subtracting income accrued but not received in the previous year ($ 480,317.63), and then adding in accrued but unreceived income ($ 369,881.38). These figures don't add up. None of the underlying books or records are in evidence. The parties have stipulated to the $ 13,809,941.86 total bank deposits figure. The stipulated figure for accrued but unreceived income is $ 369,831.38, not the $ 369,881.38 figure that appears in the trial transcript.↩
6. Respondent still challenges the deductibility of these items on the theory that petitioner was or properly should be considered to be a cash-basis taxpayer.↩
7. Petitioner filed an amended petition listing "supplies expenses" in addition to the expense categories listed above. Later, due to the parties' confusion at trial, the Court suspended the proceedings for a day and directed the parties to confer and determine the items remaining at issue. "Supplies expenses" is not listed on the schedule of expenses remaining at issue that the parties prepared at the Court's direction. Moreover, on brief petitioner does not request the Court to find that it incurred "supplies expenses". Accordingly, we deem petitioner to have conceded the deductibility of this alleged expense. ↩
8. On brief petitioner requests the Court to find several items of unpaid expenses petitioner incurred during the taxable year, but did not list in its amended petition. At trial respondent objected to these items, and petitioner agreed to limit its request for relief to those items listed in its amended petition. Accordingly, respondent still objects to any deductions for "miscellaneous", "office expense", "rent expense", "road expense", or "telephone", listed on Exhibit 36-Y as incurred but not paid. However, respondent has agreed to the figures for these items and cannot argue that she was prejudiced in any way by the fact that the items were not included in the amended petition. Therefore, the Court will treat these items as if tried by implied consent of the parties and as if the Court had permitted petitioner to amend its pleadings to conform to the evidence. Rule 41(b)(1).↩
9. Davis' testimony as to how interest was calculated was incomprehensible. While the Court thinks that some amount of interest probably accrued, there is no evidence in the record on which the Court can make even a rough approximation. After the trial the parties stipulated into evidence copies of 11 contracts for purchases of 11 of petitioner's 78 tractors. While these 11 contracts show amounts for interest, the Court cannot determine whether any such interest is part of the interest actually paid for the year to which the parties have stipulated or represents accrued but unpaid interest.↩
10. While Davis' testimony at trial suggested that it was Georges and CMCS who failed to pay drivers, the DOL administrative law judge's decision and order indicates that it was petitioner itself. It should be remembered that DOL was claiming over $ 1,000,000 from petitioner for these wage violations.↩
11. The Court looked at the statements of income and expense for the 3 previous years and attempted to arrive at an average ratio of contract carriers' expenses to co-drivers' expenses. This could not be done. In earlier years petitioner's statement of income and expenses had expense categories for contract carriers and contract drivers. There is no indication that contract drivers are co-drivers, except the fact that the contract drivers category disappears from the statement of income and expenses in 1981. Moreover, the ratio of contract carrier expenses to contract driver expenses varied widely over the three years.↩
12. Davis testified that petitioner's business doubled at Christmas, that in low volume months petitioner's expenses with Schumann Tire were in the $ 25,000 range and that in high volume months petitioner's expenses were in the $ 60,000 range. Williams' testimony corroborates Davis' testimony to some extent. Williams, the general manager of Schumann Tire, stated that there may have been some months when petitioner's payments to Schumann Tire were in the $ 20,000 range and some months when petitioner's payments were in the $ 60,000 range, but that petitioner's payments averaged $ 40,000-$ 50,000 per month. However, Exhibit 40, a Schumann Tire statement of petitioner's account, shows that petitioner made a $ 40,000 payment on or about 12/31/80 and incurred roughly $ 43,000 in expenses during the period beginning 12/26/80 and ending 1/28/81. The $ 40,000 payment shown in Exhibit 40 occurred during the busiest part of petitioner's year. Relying on Davis' testimony that petitioner's expenses doubled during the Christmas season, the Court finds that for eight (8) months out of the year petitioner's expenses averaged $ 20,000 per month. Two months are deleted -- May and June. Williams could not remember whether petitioner continued to do business with Schumann Tire after Georges took over, and Georges testified that CMCS paid all of the operating expenses while it ran petitioner. Respondent has agreed that petitioner incurred and paid $ 108,663.03 in expenses to Schumann Tire during the taxable year. Accordingly, petitioner is entitled to an additional deduction of approximately $ 131,337, as follows: $ 40,000 X 2 months =
$   80,000
20,000 X 8 months =
160,000
$ 240,000
less amount substantiated
by canceled checks and
conceded by respondent
108,663
Estimated additional
expense incurred but not
necessarily paid
$ 131,337
The Schumann Tire statements indicate terms of 30 days net, and one statement shows a small credit balance in petitioner's favor at the beginning of the month, suggesting perhaps that petitioner normally paid up its account each month. However, since petitioner was a good customer, Mr. Hart may have allowed petitioner to pay its account a little late, i.e., when the next Postal Service payment was received or may have even allowed petitioner to run up a bill of as much as this $ 131,377. For these reasons, the Court is willing to estimate this amount of additional tire expense as accrued but not necessarily paid.↩
13. While Hood testified that this account reflected no activity in the account for fiscal year 1981, that does not mean that owner-operators made no payments on their tractors from July 1, 1980 through June 30, 1981. The record shows that petitioner automatically deducted the tractor payments from the salary paid to the owner-operators for their driving services. The loss figure on Hood's statement of income and expenses for the 1981 year ($ 1,471,684.11) is one of the figures that either Davis or his father (Jones E. Davis) furnished to Hood. See supra↩ note 4. Hood had no personal knowledge about this item. The one owner-operator who testified at the trial stated that he borrowed money to pay off the loan on his tractor after it had been repossessed. Presumably that loan balance was paid off, and the record does not establish that petitioner suffered any loss on that transaction or on any other transactions with the owner-operators.
14. While the matter is not wholly free of doubt, we think that petitioner kept contemporaneous books of account for the 3 preceding taxable years. It is possible that petitioner never kept contemporaneous books and saddled Hood each year with the Herculean task of creating the books quickly enough after year end to timely report petitioner's income. If that were the situation, the Court might possibly reach a different conclusion as to petitioner's accounting method in earlier years. However, respondent argued, and we have found as a fact, that Hood only audited the books and prepared the financial statements and the tax returns for petitioner. Since Hood audited the books, we think it is a reasonable inference that there were existing contemporaneously prepared books for him to audit each year.↩
15. The taxpayer's victory was a short-lived one, since the Board went on to find that the item of income in issue was nonetheless constructively received by the taxpayer and hence currently taxable even under the cash method of accounting.↩
16. However, any evidentiary problems in this case did not arise out of the fact that petitioner's accounting books and records were reconstructed in 1987, years after the events. Any evidentiary problems in this case arose because petitioner tried to offer in evidence summaries of data from petitioner's books and records, without having afforded respondent a reasonable opportunity to examine the underlying books and records in order to verify the accuracy or completeness of such summaries. Fed. R. Evid. 1006↩. The court refused to admit such summaries into evidence.
17. Computation of petitioner's income under the cash receipts and disbursements method of accounting for 1981 would result in both the double inclusion of the ending balance of petitioner's accounts receivable for the fiscal year ended June 30, 1980, and the double deduction of the ending balance of petitioner's accounts payable for the same period. Moreover this computation would ignore the ending balance in petitioner's accounts receivable and accounts payable for the fiscal year ended June 30, 1981.↩
18. On the first day of trial the Court warned petitioner that it would have to produce its records substantiating its claimed deductions. The Court recessed the trial for a day to permit petitioner to do this. Instead, when the trial resumed on the third day, petitioner offered summaries of its records, summaries that had been prepared the preceding day. The Court refused to receive the summaries because respondent had not been afforded an opportunity to examine the underlying records in order to verify the summaries. Fed. R. Evid. 1006; see supra↩ note 16.
19. See, e.g., Taube v. Commissioner, 88 T.C. 464, 489-490 (1987); Cohen v. Commissioner, 21 T.C. 855, 856-857 (1954); Chas. Schaefer & Son, Inc. v. Commissioner, 20 T.C. 558, 561 (1953); Pierce Estates, Inc. v. Commissioner, 16 T.C. 1020, 1025-1026 (1951), revd. on other grounds 195 F.2d 475 (3d Cir. 1952); Jorden v. Commissioner, 11 T.C. 914, 924-925↩ (1948). 20. See particularly Taube v. Commissioner, supra, and Cohen v. Commissioner, supra↩.
21. Respondent seems to acknowledge that the foreclosure sales resulted in losses and that sec. 1245 does not generate recapture in loss transactions. See supra↩ note 1. While petitioner is not entitled to deduct any of the foreclosure losses in the taxable year in issue, respondent is not entitled to adjust petitioner's gross income to recharacterize any nonexistent gains as recapture income. To the extent the parties have agreed that certain of the foreclosure sales resulted in gains and that these gains are, in part, ordinary income under sec. 1245, the adjustments will stand as determined.