UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-10089
_____

IN THE MATTER OF: WEST TEXAS MARKETING CORPORATION,

Debtor.

WALTER C. KELLOGG, Trustee,
West Texas Marketing Corporation,

Appellant,

VERSUS

UNITED STATES OF AMERICA,
(Internal Revenue Service),

Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

**(May 31, 1995)**

Before SMITH, and BARKSDALE, Circuit Judges, and FITZWATER,[1]
District Judge.

RHESA HAWKINS BARKSDALE, Circuit Judge:

At issue in this Chapter 7 liquidation is whether the district court erred in holding that the estate of West Texas Marketing Corporation (WTMC), the debtor, (1) could not, for federal income tax purposes, accrue and deduct post-petition interest on undisputed and resolved general unsecured claims; and (2) was liable for a tax penalty, even though the Internal Revenue Service

_____

[1]    District Judge of the Northern District of Texas, sitting by designation.

assessed it outside the period allowed by § 505(b) of the Bankruptcy Code. We **AFFIRM**.

I.

This case was tried on stipulated facts, which are developed more fully in *In re West Texas Mktg. Corp.*, 155 B.R. 399 (Bankr. N.D. Tex. 1993), and are restated here only as necessary. In 1982, WTMC filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code; but, the bankruptcy court converted the case to a Chapter 7 liquidation in 1983.

In 1991, Kellogg, as trustee for the estate, filed amended tax returns for 1988 and 1989, on the basis that the estate (1) failed previously to deduct post-petition interest on undisputed and resolved general unsecured claims for 1988 and 1989; and, (2) could deduct net operating loss carryforwards based, in part, on post-petition interest for such claims for 1982 through 1987.[2] On WTMC's 1991 return, Kellogg sought also to deduct post-petition interest for such unsecured claims. The total interest expense was approximately $12.6 million, with a total refund claim of approximately $1.1 million. The IRS disallowed the refunds.

In addition, prior to the attempt to deduct post-petition interest, the IRS had assessed a penalty of approximately $23,000 against WTMC for 1989, because it failed to make estimated tax payments. Eventually, the IRS set off this penalty against a refund due WTMC for 1988.

---

[2] WTMC's accounting period runs from October 1 to September 30. For example, taxable year 1988 represents October 1, 1987, to September 30, 1988.

As a result of, *inter alia*, both actions by the IRS, Kellogg filed this adversary proceeding. The bankruptcy court denied relief; the district court affirmed.

## II.

### A.

It goes without saying that, generally, pursuant to I.R.C. § 163, a corporation may deduct all interest paid or accrued within the taxable year on indebtedness. Kellogg maintains that WTMC's liability *vel non* for post-petition interest is a question of state law: that, because the unsecured claims constitute a fixed liability when the petition was filed, the Texas statutory rate of 6% establishes a present and unconditional liability for interest on those claims; and that federal law determines only the priority of how assets of the estate are to be distributed in satisfaction of the claims against it.

In ***Vanston Bondholders Protective Comm. v. Green***, 329 U.S. 156 (1946), the Court recognized that "[w]hat claims of creditors are valid and subsisting obligations against the bankrupt *at the time a petition in bankruptcy is filed*, is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *Id.* at 161 (emphasis added). Thus, the validity of any interest that may have accrued prior to the filing of the petition is resolved generally by state law. But, once the petition is filed, federal law controls. *Id.* at 163 ("[w]hen and under what circumstances federal courts will allow interest on

- 3 -

claims against debtors' estates being administered by them has long been decided by federal law").

Sections 446(a) and 461(a) of the Internal Revenue Code provide that taxable income is computed, and deductions taken, under the accounting method that the taxpayer normally uses for his books. I.R.C. §§ 446(a), 461(a).[3] WTMC maintained its books, and calculated its federal income tax liability, utilizing the accrual method. Under that method, the standard for determining when an expense has been incurred for federal income tax purposes has been the "all events" test. During the years at issue, the test required that two elements be met before accrual of an expense would be allowed: first, all the events must have occurred that establish the fact of the liability; and, second, the amount of the liability must be capable of being determined with reasonable accuracy.[4] Only the first element is at issue.

---

[3] I.R.C. § 446(a) provides: "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books".

I.R.C. § 461(a) provides: "The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income".

[4] The Treasury Regulation in force from 1982 to 1991 provided that "an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy". Treas. Reg. § 1.461-1(a)(2) (1991). In 1992, the Regulation was modified to provide for the deduction of expenses "in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability". Treas. Reg. § 1.461-1(a)(2)(i) (1992).

- 4 -

"[A]lthough expenses may be deductible before they have become due and payable, liability must first be firmly established.... [A] taxpayer may not deduct a liability that is contingent...." *United States v. General Dynamics Corp.*, 481 U.S. 239, 243 (1987); *accord* *United States v. Hughes Properties, Inc.*, 476 U.S. 593, 600-01 (1986). In describing this noncontingent requirement, the Supreme Court has required also that the liability be "fixed and absolute", *Hughes*, 476 U.S. at 600 (quoting *Brown v. Helvering*, 291 U.S. 193, 201 (1934)), and "unconditional", *id.* (quoting *Lucas v. North Tex. Lumber Co.*, 281 U.S. 11, 13 (1930)).

The issue is not the ability *vel non* of WTMC to pay post-petition interest on the unsecured claims. *See* *Fahs v. Martin*, 224 F.2d 387 (5th Cir. 1955) (interest for which an accrual basis taxpayer is presently and unconditionally liable, but which is unlikely to be paid by reason of his insolvency, is still deductible).[5] Rather, we must determine whether WTMC's liability for post-petition interest is fixed, absolute, unconditional, or not subject to any contingency. *See* 2 MERTENS LAW OF FED INCOME TAX § 12A.139 (1993) ("[w]hile cases have held interest is deductible when there is improbability of payment it is well to note that in none was there any uncertainty (substantial contingency) of the liability itself").

---

[5]   For all but one of the years at issue, the total undisputed and resolved claims against WTMC exceeded WTMC's assets. Thus, it was extremely unlikely that WTMC would be able to pay such claims. As noted, however, this fact is not dispositive of the issue before us.

Section 502 of the Bankruptcy Code sets forth a general rule that claims for post-petition interest are not allowed against the estate. 11 U.S.C. § 502(b)(2).[6] One of the principles underlying this provision is that "interest stops accruing at the date of the filing of the petition." H.R. REP. NO. 595, 95th Cong., 1st Sess. 353 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309; S.R. REP. NO. 989, 95th Cong., 2d Sess. 63 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849; *see **In re Brints Cotton Mktg., Inc.***, 737 F.2d 1338, 1341 (5th Cir. 1984) ("post-petition accumulation of interest (allowable by state law) on claims against a bankrupt's estate are suspended").

The Code provides, however, for several exceptions to this general rule. Section 726(a) establishes hierarchial priorities when distributing a debtor's estate in a Chapter 7 liquidation. Included within the priorities is the payment of post-petition interest on claims against the estate *if* any assets remain after

--------

[6] Section 502 of the Bankruptcy Code provides, in pertinent part:

>    (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.

>    (b) ... if such an objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount, except to the extent that --

>    ....

>    (2) such claim is for unmatured interest.

11 U.S.C. § 502.

distributions for prioritized claims, unsecured claims, and penalties, fines, and nonpecuniary damages. 11 U.S.C. § 726(a)(5). The only distribution occupying a lower position on the hierarchy is the return of any remaining assets to the debtor.[7]

---

[7] Section 726 of the Bankruptcy Code provides that:

> (a) ... property of the estate shall be distributed --
>
> > (1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title [(prioritized claims)];
> >
> > (2) second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection ...;
> >
> > (3) third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph 2(C) of this subsection;
> >
> > (4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;
> >
> > (5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and
> >
> > (6) sixth, to the debtor.

In **Guardian Investment Corp. v. Phinney**, 253 F.2d 326 (5th Cir. 1958), a taxpayer sought to deduct interest on a second mortgage, even though no payments of principal or interest would be due until payment of the first mortgage. Additionally, according to the terms of the second mortgage, payments on it could be made only from the net proceeds of any sale of the mortgaged property. Thus, the potential existed that no payments on the second mortgage would ever be made.

Although **Guardian Investment** addressed whether the principal due on the second mortgage was contingent, it still provides a framework to consider the contingent nature of an obligation for income tax purposes.[8] In finding the indebtedness to be contingent, the **Guardian Investment** court examined five aspects of the obligation: (1) is there a fixed or determinable date of maturity; (2) is the obligation owed only upon the happening of a condition; (3) is the happening of that condition uncertain; (4) is that condition to occur *in futuro*; and, (5) is there a fixed or determinable liability? **Id.** at 331. Considering the aggregate of these factors, our court held that the liability on the second mortgage was not "a fixed, definite, existing obligation". **Id.**

Implicit in the obligation under § 726 to pay post-petition interest on unsecured claims is the necessary condition that

---

[8] We rely upon **Guardian Investment** to provide structure for our analysis of the contingent nature of WTMC's liability for post-petition interest, not to command of itself the result we reach on the basis of §§ 502(b) and 726(a). We need not, therefore, concern ourselves with factual distinctions between **Guardian Investment** and the present case.

sufficient assets remain following distributions under § 726(a)(1)-(4).  These distributions could not occur during the taxable years at issue, and there is no fixed or determinable date when these distributions will occur; the condition is *in futuro*.  Because Kellogg seeks to deduct post-petition interest on undisputed claims, the amount of such liability can easily be determined.  When taken in the aggregate, and based upon the principles of accrual accounting, we conclude that, under the all events tests, WTMC's liability for post-petition interest has not been established.  Our court recognized in **Guardian Investment** that, "if the proceeds from the sale of the mortgaged property [were] not sufficient to pay off the first mortgage, the taxpayer [would] not [be] under any obligation to pay any interest or principal of the second mortgage".  **Id.** at 331.  Similarly, if, in the distribution of WTMC's assets in accordance with § 726(a)(1)-(4), all assets are depleted, then the estate will not have incurred any obligation to pay interest on unsecured claims.  This is not due to the fact that payment became impossible, but because the condition necessary to create the liability for the post-petition interest failed to occur.

Accordingly, Kellogg may not now deduct post-petition interest on undisputed and resolved, general unsecured claims against the estate.[9]

---

[9]     Of course, if assets remain after distributions are made pursuant to § 726(a)(1)-(4), then liability for post-petition interest will be established.

B.

The other issue is whether the IRS violated the tax liability discharge provision of 11 U.S.C. § 505(b) when it assessed the estimated tax penalty for 1989 and used it as a setoff against a refund due for 1988.[10]  Section 505(b) allows trustees to request

---

[10]    As a preliminary matter, the IRS contends, erroneously, that, because the United States did not waive sovereign immunity, the district court lacked jurisdiction to consider whether WTMC was entitled to a refund for the penalty.  It maintains that, as a statutory condition precedent to a refund suit, the taxpayer must file a claim for the refund.

Section 7422 of the Internal Revenue Code provides that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax ... until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof".  I.R.C. § 7422(a).  Furthermore, Bankruptcy Code § 505(a)(2)(B) provides that a bankruptcy court may not determine

> any right of the estate to a tax refund, before the earlier of --
>
> (i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or
>
> (ii) a determination by such governmental unit of such request.

11 U.S.C. § 505(a)(2)(B).

Between submission of briefs and oral argument, however, Congress enacted the Bankruptcy Reform Act of 1994 by which it, *inter alia*, abrogated expressly, and retrospectively, a claim of sovereign immunity with respect to § 505.  Pub. L. No. 103-394, § 113, 108 Stat. 4106, 4117.  Section 113 of the Act provides in pertinent part:

> Section 106 of title 11, United States Code, is amended to read as follows:
>
> "**§ 106.  Waiver of sovereign immunity**
>
> "(a) Notwithstanding  an  assertion  of

- 10 -

a determination of any unpaid tax liability from the appropriate governmental unit, and provides that, unless that entity notifies the trustee within 60 days that the return has been selected for examination, "the *trustee, the debtor, and any successor to the debtor* are discharged from any liability for such tax" unless the return is fraudulent or contains a material misrepresentation.  11 U.S.C. § 505(b) (emphasis added).[11]   Kellogg made a § 505(b)

<div style="margin-left:2em;">

sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

> "(1) Section[] ... 505 ... of this title.

> "(2) The Court may hear and determine any issue arising with respect to the application of such sections to governmental units.

> ...."

</div>

108 Stat. 4106, 4117-18.  And, pursuant to § 702(b)(2)(B) of the Act, this amendment is made applicable to all pending cases:

> The amendments made by sections 113 and 117 shall apply with respect to cases commenced under title 11 of the United States Code before, on, and after the date of the enactment of this Act.

108 Stat. 4106, 4150.

Although, in his rebuttal at oral argument, counsel for Kellogg noted the recent Act, neither side filed a letter citing supplemental authority as permitted by FED. R. APP. P. 28(j).  We note that the Government is obviously cognizant of Rule 28(j), in that it filed a 28(j) letter on a different issue in this case. Needless to say, supplemental briefs should have been filed.

[11]   Section 505(b) of the Bankruptcy Code provides:

> A trustee may request a determination of any unpaid liability of the estate for any tax incurred during the administration of the case by submitting

- 11 -

request, but the IRS did not assess the penalty within the 60 day limit.  We must determine, therefore, whether § 505(b) bars the subsequent assessment and collection of the penalty against the estate.[12]

1.

The IRS contends that Kellogg's reliance on § 505(b) is misplaced because this issue does not involve the IRS seeking to

_____

a tax return for such tax and a request for such a determination to the governmental unit charged with responsibility for collection or determination of such tax.  Unless such return is fraudulent, or contains a material misrepresentation, the trustee, the debtor, and any successor to the debtor are discharged from any liability for such tax --

(1)  upon payment of the tax shown on such return, if --

(A)  such governmental unit does not notify the trustee, within 60 days after such request, that such return has been selected for examination; or

(B)  such governmental unit does not complete such an examination and notify the trustee of any tax due, within 180 days after such request or within such additional time as the court, for cause, permits;

(2)  upon payment of the tax determined by the court, after notice and a hearing, after completion by such governmental unit of such examination; or

(3)  upon payment of the tax determined by such governmental unit to be due.

11 U.S.C. § 505(b).

[12]    Kellogg challenges the underlying merits of the penalty.  The only time Kellogg previously raised this issue was in a reply brief to the bankruptcy court.  (It was not in the pretrial order.)  It appears that the issue was not raised in, or considered by, the district court.  In any event, we consider it waived.

assess or collect taxes; rather, any tax liability for the penalty has been extinguished because it was used as a setoff against the refund due for 1988. Thus, the IRS maintains, this claim is instead for a refund, governed by § 505(a).[13]

As noted, Kellogg filed a timely return for 1989, and requested a prompt determination pursuant to § 505(b). A month later, the IRS notified Kellogg that the return had been accepted as filed and issued a refund check. But, over three months after the 1989 return was filed, the IRS notified Kellogg of the penalty and, subsequently, used it as a setoff against the refund due for 1988. If WTMC had not had that refund due, the IRS would not have been able to collect the penalty as it did. Only because the IRS found WTMC in the fortuitous position of being entitled to a refund for the prior tax year was it able to offset. Claiming that these events mandate that Kellogg is not entitled to raise a § 505(b) timeliness issue places form over substance.

2.

Under 505(b), the failure of the IRS to act in a timely manner discharges potential tax liability of, *inter alia*, the debtor and the trustee. At issue is whether this failure discharges the

---

[13] Section 505(a)(1) of the Bankruptcy Code provides that

> the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1).

- 13 -

estate as well, under the section's nomenclature of "any successor to the debtor". This is an issue of first impression for any circuit court. Of the two lower courts to have considered directly this issue, both have held that the estate does not enjoy the discharge given to "any successor to the debtor". *In re Fondiller*, 125 B.R. 805 (N.D. Cal. 1991); *In re Rode*, 119 B.R. 697 (Bankr. E.D. Mo. 1990); *but see* *In re Flaherty*, 169 B.R. 267, 270 n.4 (Bankr. D.N.H. 1994) (declaring, in dictum, that "[a]lthough the actual wording of subsection (b) of the statute is `the trustee, the debtor, or any successor to the debtor are discharged from any liability for such tax,' ... this language effectively discharges *the estate* of the tax, as well").

It goes without saying that our interpretation of a statute begins with its language. The Bankruptcy Code defines a debtor as a "person or municipality concerning which a case under this title has been commenced", 11 U.S.C. § 101(13); and a "person" includes an "individual, partnership, and corporation". 11 U.S.C. § 101(41). Thus, a "debtor" must be an individual, partnership or corporation, and it follows that any "successor to the debtor" must also be an individual, partnership or corporation. It becomes more obvious that the estate cannot be a "successor" when we consider what is an "estate". An "estate" is created at the commencement of the bankruptcy case, and is "comprised" of, *inter alia*, "all legal and equitable interests of the debtor in property as of the commencement of the case". 11 U.S.C. § 541(a), (a)(1).

- 14 -

Furthermore, § 505(c) uses the term "estate" as distinct from the terms "debtor" and "successor to the debtor".  Section 505(c) provides that, after the court makes a determination of tax under § 505, "the governmental unit charged with responsibility for collection of such tax may assess such tax against the estate, the debtor, or a successor to the debtor ...."  Thus, the clear distinction between the "estate" and "successor to the debtor" demonstrates that Congress did not intend for the discharge of tax liability under § 505(b) to apply to the estate.

In addition to the Code's plain language, the situation faced by trustees prior to the enactment of the Bankruptcy Code illumines the purpose to be served by § 505.  Prior to the Code, trustees lacked a mechanism for obtaining a prompt determination of the tax liability of the estate.  Therefore, a trustee wishing to have the case closed was confronted with the choice of leaving the estate open until the IRS's opportunity to review the estate's tax expired, or proceed to have the case closed and face the potential of personal liability for additional taxes that the IRS might determine subsequently were due.  Section 505(b) provided the solution to this dilemma.  1A Collier on Bankr. (MB) ¶ 12.04[3].

> Although [§ 505(b)] was envisioned as a mechanism to permit a determination of tax liability at the conclusion of the administration of an estate, *i.e.*, a single request for a prompt determination of all the relevant tax periods, there is nothing in its language to prevent successive requests as each tax period is completed and a return filed apart from the obligation to pay the taxes shown on such returns.

*Id.*

## III.

For the foregoing reasons, the judgment is

**AFFIRMED**.

JERRY E. SMITH, Circuit Judge, dissenting:

Ever since this circuit decided <u>Fahs v. Martin</u>, 224 F.2d 387 (5th Cir. 1955), the settled rule has been that an accrual basis taxpayer immediately may deduct, under the Internal Revenue Code, an expense such as interest legally owed, notwithstanding the improbability of payment. <u>Id.</u> at 393. No distinction is made between a debt backed by the full faith and credit of the United States and one owed by a creditor who has not only tottered at the brink of bankruptcy but has fallen into the chasm. The majority today would retreat from our rule in the case of interest imposed by state law during the pendency of bankruptcy ("pendency interest"). As I believe the majority misinterprets the Bankruptcy Code, extinguishes a state property right and creates a federal one, and confuses the distinction between improbable and contingent payment, I respectfully dissent.


                                A.

I begin by examining the source of the interest at issue. The obligation to pay interest for debts owed on contracts and accounts is a creation of the law of contract. Generally, contract law among private parties in our federalist system is state law. Under the state law of contract here, Texas law, the background rule for debts owed on accounts and contracts is that interest at six percent will be imposed thirty days after the debt was due, unless the parties agree otherwise. TEX. REV. CIV. STAT. ANN. art. 5069-1.03 (West 1987). The majority does not doubt that such a property

-17-

right and its obligations existed prior to the imposition of bankruptcy.

The majority, however, believes that, post-petition, federal law controls. See Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 163 (1946) ("When and under what circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law."). The majority does not specify what it means by "controls." Presumably, however, the majority means that federal law defines which debts are valid, as that was the position taken here by the government and bankruptcy court below. See Kellogg v. United States (In re West Texas Mktg. Corp.), 155 B.R. 399, 402 (Bankr. N.D. Tex. 1993) (positing that both state and federal law are "sources of liability for postpetition interest on general unsecured claims"). This view is only half right.

The federal law of bankruptcy is not designed to create debts among parties but to determine how existing debts should be distributed to creditors fairly. Justice Frankfurter's concurrence in Vanston explains as much:

> The business of bankruptcy administration is to determine how existing debts should be satisfied out of the bankrupt's estate so as to deal fairly with the various creditors. The existence of a debt bewteen the parties to an alleged creditor-debtor relation is independent of bankruptcy and precedes it. Parties are in a bankruptcy court with their rights and duties already established, except insofar as they subsequently arise during the course of bankruptcy administration or as part of its conduct. Obligations to be satisfied out of the bankrupt's estate thus arise, if at all, out of tort or contract or other relationship created under applicable law. And the law that fixes legal consequences to transactions is the law of the several States.

-18-

<u>Vanston</u>, 329 U.S. at 169 (Frankfurter, J., concurring); <u>see also</u> <u>id.</u> at 161 ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law.") (Black, J.) (majority opinion); <u>Grogan v. Garner</u>, 498 U.S. 279, 283 (1991) ("The validity of a creditor's claim is determined by rules of state law.").

This point bears stressing.  Nothing in the Bankruptcy Code awards damages for failure to deliver goods or injury from the negligent operation of a vehicle.  Nor does it create the right to collect interest from an unpaid debt.

Bankruptcy law does control in the sense that courts ultimately may not enforce such rights in carrying out their constitutional and statutory obligations.  As Justice Frankfurter continued:

> Of course a State may affix to a transaction an obligation which the courts of other States or the federal courts need not enforce because of overriding considerations of policy.  And so, in the proper adjustment of the rights of creditors and the desire to rehabilitate the debtor, Congress under its bankruptcy power may authorize its courts to refuse to allow existing debts to be proven.

<u>Vanston</u>, 329 U.S. at 169.  Thus, a state-law debt may enter the controls of the Bankruptcy Code as valid, but ultimately may not be enforced if the bankruptcy court, through its congressionally granted equitable powers, determines otherwise.  <u>See</u> <u>Fahs</u>, 224 F.2d at 395 ("[W]e interpret [<u>Vanston</u>] only as establishing the

equitable power and duty of bankruptcy courts to subordinate such a claim.").[14]

                                    B.

I have stressed the distinction between state property law and federal bankruptcy law in some detail, as that distinction is critical in understanding how federal bankruptcy law "controls" here.  Kellogg's state law obligation to pay interest on its over-due debts pre-dates the imposition of bankruptcy.  Now, the question we must answer is when, in the bankruptcy proceedings, such a state law right is extinguished.

Turning to the Bankruptcy Code, I note that section 502(a), 11 U.S.C. § 502(a), provides, in pertinent part, that a claim is allowed unless a party in interest objects.  Upon objection, section 502(b) provides, in relevant part, that "the court, after notice and a hearing, shall determine the amount of such a claim . . . and shall allow such a claim in such amount except to the

---

[14] In Fahs, we further explained our position, stating:
The majority opinion [in Vanston] may be reconciled with [the concurrence's] unquestionably correct principles only if it is regarded, as we regard it, as not declaring the obligation (regardless of validity under state law) void, but merely as subordinating it.

224 F.2d at 395 n.5.  See also  Pepper v. Litton, 308 U.S. 295, 310-12 (1939) (holding that bankruptcy court has equitable power to disallow or subordinate state judgment); Addison v. Langston (In re Brints Cotton Mktg., Inc.), 737 F.2d 1338, 1341-42 (5th Cir. 1984) ("[W]hile state law ordinarily determines what claims of creditors are valid and subsisting obligations, a bankruptcy court is entitled (if authorized by the federal bankruptcy statute) to determine how and what claims are allowable for bankruptcy purposes, in order to accomplish the statutory purpose of advancing a ratable distribution of assets among the creditors."); see generally  3 Daniel R. Cowans, Cowan's Bankruptcy Law and Practice § 12.7, at 39-40 (1994) (examining interrelationship of state law claims and "allowability" under the Bankruptcy Code).

extent that)) . . . (2) such a claim is for unmatured interest."

This section is a codification of the pre-Code rule that courts need not recognize the accrual of interest during the pendency of bankruptcy.[15] When read in isolation, the plain language of § 502(b)(2) appears to extinguish a creditor's right to earn interest and a debtor's obligation to pay it.

A court's duty in interpreting the Bankruptcy Code, however, is to read the statute holistically. United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988). As the majority recognizes, Congress has codified an exception to the general rule.[16] Section 726(a) of the Bankruptcy Code, which controls the order of distribution in chapter 7 cases, mandates to the court that the

property of the estate shall be distributed))

(5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection . . . .

---

[15] See Sexton v. Dreyfus, 219 U.S. 339, 344-46 (1911) (examining origins of American rule derived from English bankruptcy system); see also Thomas v. Western Car Co., 149 U.S. 95, 116-17 (1893) (recognizing rule); American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261, 266-67 (1914) (recognizing rule and exceptions); City of New York v. Saper, 336 U.S. 328, 330 & n.7 (1949) (same).

[16] In fact, the Code provides at least three exceptions. Section 726(a)(5) is discussed in the text. Section 506(b) allows interest to a secured creditor to the extent the secured property is greater than the amount of the claim. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 245-46 (1989) (interpreting § 506(b)). Section 1124 specifically permits reinstatement of a debt according to its original contractual terms if the debtor brings current the payments of principal and interest accrued during bankruptcy. See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 380 (5th Cir. 1987) (en banc) (Jones, J., dissenting), aff'd, 484 U.S. 365, 371 (1988).

This rule, like that codified in § 502(b)(2), claims an impressive pedigree from a long line of pre-Code decisions. See, e.g., 2 WILLIAM BLACKSTONE, COMMENTARIES *488 ("[T]hough the usual rule is, that all interest on debts carrying interest shall cease from the time of issuing the commission, yet, in the case of a surplus left after payment of every debt, such interest shall revive, and be chargeable to the bankrupt or his representatives.").[17] Its effect is that when sufficient assets remain in the estate after prior distributions, the bankruptcy court is required to pay the creditors interest.[18] The only lower distribution returns the remaining assets to the debtor. § 726(a)(6).

Accordingly, throughout bankruptcy, the debtor retains the obligation to pay its creditors interest. When sufficient assets remain upon distribution, the court must provide for the payment of interest. No doubt the creditors would insist on as much. And, while actual payment may be unlikely, the obligation to pay is not. Such an obligation, therefore, is not extinguished, but, for purposes of the bankruptcy proceedings, is ignored until the time

---

[17] Thus, while pre-Code precedent supports the argument that interest stops running when a bankruptcy petition is filed, Sexton, 219 U.S. at 344, this practice was not absolute. Two, if not three, exceptions were recognized. See Ron Pair, 489 U.S. at 246. The two well-recognized rules were: If the alleged bankrupt proved solvent, creditors received post-bankruptcy interest before any surplus was returned to the bankrupt; and if securities of the bankrupt produced interest or dividends during bankruptcy, such amounts were supplied to post-bankruptcy interest. Saper, 336 U.S. at 330 n.7. Of more doubtful origin, under pre-Code precedent, was an exception for oversecured claims. Ron Pair, 489 U.S. at 246.

[18] Because § 726(a)(5) states that the interest should be set "at the legal rate," Texas state law determines the existence and amount of interest. See generally Chaim J. Fortgang & Lawrence P. King, The 1978 Bankruptcy Code: Some Wrong Policy Decisions, 56 N.Y.U.L. Rev. 1148, 1151-52 (1981) (discussing whether "legal rate" means statutory rate or rate set by contracts). As no rate was set by the contracts here, this problem is not presented.

the court determines whether the debtor's assets can meet the obligation.[19]  Only upon discharge, see § 727, is the state law obligation to pay extinguished.

This result occurs because § 502(b)(2) is a matter of convenience, not substantive law.[20]  That section is premised upon the idea of making bankruptcy proceedings easier and fairer to administer, not replacing state property law with federal.  The Supreme Court explained the pre-Code justification of the rule thus:

---

[19]  Courts in applying the general rule of 502(b)(2) have used various terms to describe its effect:  Interest is "suspended," Nicholas v. United States, 384 U.S. 678, 682 & n.9 (1966), ceases to run, Ron Pair, 489 U.S. at 246, stops, Saper, 336 U.S. at 330, is "not computed," Sexton, 219 U.S. at 344, and is not allowed, Vanston, 329 U.S. at 163.  The exact terminology, while important, does not overcome the requirements of the Bankruptcy Code, however.  As discussed below, where the Code provides an exception to the general rule, the right to the interest continues to exist.

[20]  The leading commentary on bankruptcy has recognized as much:

[C]are must be taken not to confuse tax accrual concepts and payment in a title 11 context.  Section 502(b)(2) of the Bankruptcy Code prescribes the grounds for objecting to claims in a title 11 case.  By itself, it does not change the legal rights of the holder of an obligation against the debtor.  Put another way, the general rule in title 11 cases that there is no accrual of postpetition interest is a rule of convenience governing distributions to creditors.  It is not a rule of substantive law that converts an interest-bearing indebtedness to a nonenforceable, non-interest-bearing indebtedness.  Even In re Continental Vending Mach. Corp., [77-1 U.S. Tax Cas. (CCH) ¶ 9,121, at 86,093 (E.D.N.Y. 1976)], which is often cited for the opposite position against tax accrual of post-petition interest, state unequivocally:

A bankruptcy petition, whether straight or a corporate reorganization, . . . suspends or postpones the accrual of interest even though the "claim has not lost its interest-bearing quality."

Id. at 86,097-98 (citing 6A COLLIERS ON BANKRUPTCY ¶ 9.08, at 194 (14th ed.)).

1A ELIOT G. FREIER ET AL., COLLIERS ON BANKRUPTCY ¶ 22.05, at 22-40 (Lawrence P. King ed., 15th ed. 1988) [hereinafter COLLIERS ON BANKRUPTCY];  see also 3 COLLIERS ON BANKRUPTCY, supra, ¶ 502.02[2] (discussing general principles of bankruptcy as applied to unmatured interest).

> Accrual of simple interest on unsecured claims in bankruptcy was prohibited in order that the administrative inconvenience of continuous recomputation of interest causing recomputation of claims could be avoided. Moreover, different creditors whose claims bore diverse interest rates or were paid by the bankruptcy court on different dates would suffer neither gain nor loss caused solely by delay.

Vanston, 329 U.S. at 164. Nothing in the text or the legislative history of this section of the Bankruptcy Code, which admits to codifying much of the pre-Code practice, suggests that Congress adopted this rule for any other purpose. See John C. McCoid, II, Pendency Interest in Bankruptcy, 68 Am. Bankr. L.J. 1, 9 (1994) ("Though Congress said more this time, there is nothing in the legislative history that indicates any intention to effect any change in the law on the subject of pendency interest by virtue of these sections.").[21]

---

[21]    Indeed, the legislative history in the Senate and House reports accompanying the Bankruptcy Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549, shows that the current Bankruptcy Code enacted much of the pre-Code rules regarding pendency interest. See S. Rep. No. 989, 95th Cong., 2d Sess. 62-63 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5848-89 (stating that § 502(b)(2) contains "two principles of current law," including rule that unmatured interest is disallowed); H. Rep. No. 595, 95th Cong., 1st Sess., 352-53 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6308 (same); S. Rep. No. 989, 95th Cong., 2d Sess. 97 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5883 (stating that §726(a)(4) provides that punitive penalties are subrogated to all other claims, "except interest accruing during the case"; § 726(a)(5) provides for post-petition interest where assets remain); H. Rep. No. 595, 95th Cong., 1st Sess. 383 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6339 (same); see also Report of the Committee of Finance, S. Rep. No. 95-1106, 95th Cong., 2d Sess. 22-23 (1978), reprinted in 3 app. COLLIERS ON BANKRUPTCY, supra, at Tab VI (recognizing "subordination rule" for post-petition interest and recommending that tax liens and interest be "non-dischargeable"). A search of the Congressional Record reveals no discussion or even language suggesting that the pre-Code rules should be discarded or Vanston legislatively overturned. See 124 Cong. Rec. 1783 (1978); 124 Cong. Rec. 32,383 (1978); 124 Cong. Rec. 34,143 (1978); 124 Cong. Rec. 28,257 (1978). Finally, the suggested bill contained in the report of the Commission of the Bankruptcy Laws of the United States, which provided much of the legislative impetus for the 1978 Act, provided an explicit provision for the payment of interest. McCoid, supra, at 8-9 (citing Report of the Commission on the Bankruptcy Laws of the United States § 4-405(a)(8), H.R. Doc. No. 137, 93d Cong. 1st Sess., Part II, at 110 (1973)).

(continued...)

Moreover, our precedent and Supreme Court caselaw conclude that § 502(b) does not void the state property interests, but only ignores it until distribution as a matter of policy. In Fahs, we stated that

> [t]he Vanston case seems to us to establish a rule only for the distribution of a bankrupt's assets. It did not hold that such a claim was void, but only that the claimant should not participate in the distribution of assets until all claims superior in conscience and fairness were paid.

224 F.2d at 394. We have followed this reasoning in applying the current Bankruptcy Code. See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1386 n.5 (5th Cir. 1986) ("Put differently, the petition suspended the contract right to accrue interest; it did not extinguish the right."), reinstated, 808 F.2d 363 (5th Cir.), (en banc), aff'd, 481 U.S. 1068 (1987).

Likewise, the Supreme Court has continued to adhere to Vanston.[22] In sum, § 502(b)(2), as a non-substantive rule, does not

---

(...continued)
I have examined the legislative history to show that the majority's reliance upon the Senate and House reports discussing § 502(b)(2) is incomplete. That section must be read in context with the other sections of the Code, their legislative history, and the pre-Code practice that the Code adopted.

[22] See Nicholas v. United States, 384 U.S. 678, 689 (1966) (quoting Vanston passage with approval); Bruning v. United States, 376 U.S. 362, 362 n.4 (1964) (same); American Iron, 233 U.S. at 266 (explaining that the pre-Code rule applies, "not because the claims had lost their interest-bearing quality during [receivership], but [because it] is a necessary and enforced rule of distribution, due to the fact that in case of receiverships the assets are generally insufficient to pay debts in full."); 3 COLLIER ON BANKRUPTCY, supra, ¶ 502.2[2], at 34-34.1 (noting that § 502(b)(2)'s "disallowance of claims for unmatured interest or claims accruing after the date of the filing of the petition is one of policy and convenience rather than a statement of substantive law").

-25-

void the state right to interest, but merely limits its eventual distribution.

While the majority does not say so explicitly, it treats section 502(b) as a substantive rule. According to the majority, the non-contingent, state-law obligation to pay pendency interest becomes "contingent" upon the filing of the bankruptcy petition. The majority does not mean that payment is contingent, as sufficient funds must remain in order for the debt to be paid. Rather, reasoning that the ultimate distribution of any interest is contingent upon there being assets remaining in the estate to pay it, the majority holds that "the condition necessary to create the liability for the post-petition interest failed to occur." (Emphasis added). See also 2 JACOB MERTENS, JR., MERTENS LAW OF FEDERAL INCOME TAX § 12A.138, at 253 (1994) ("The liability ceases to exist when the property of the corporation passes into the receiver's hands.").

In effect, the majority snuffs out the state-law obligation to pay interest and reimposes it at the end of distribution only upon the contingency that assets remain. The majority thus presents two difficult conceptual problems that it does not address. First, the majority does not explain what the source of this interest would be upon distribution. Does the majority believe that § 726(a)(5) is an independent source for a federal property right? Second, if the source of the right is Texas state property law, how is the risk of ultimate distribution under § 726(a)(5) different from the risk of distribution of any debt in bankruptcy?

The majority's non-answer to these difficult questions is to resort to one case, <u>Guardian Inv. Corp. v. Phinney</u>, 253 F.2d 326 (5th Cir. 1958), which it claims "provides a framework to consider the contingent nature of an obligation for income tax purposes." Perhaps <u>Guardian</u> does, but that case is easily distinguishable from the situation here, as in <u>Guardian</u> the obligation to pay the debt, a second mortgage, was contingent by the terms of the agreement itself. Here, the state property right is not contingent by its terms. Moreover, <u>Guardian</u> does not even mention the Bankruptcy Code. A 1958 case that fails even to mention the Bankruptcy Code can be of little assistance in interpreting the current Code, substantially codified in 1978. Its application is simply an anachronism.

Rather than wander so far afield and out of time, I would turn to the current Bankruptcy Code and interpret the interplay between §§ 502(b)(2) and 726(a)(5) as settling a scheme for distribution of the fixed obligation to pay interest. Section 502(b)(2), which directs courts to ignore pendency interest, codifies a rule of convenience in order to ease the administration of the bankruptcy process. Section 726(a)(5) preserves the debtor's obligation to pay this debt as a matter of fairness to the creditors.

This interpretation of the Bankruptcy Code is consistent with the language of the statute, pre-Code caselaw, the legislative history, the view of the leading commentary on bankruptcy, and, not

least of all, our precedent.[23]  In sum, Kellogg retains the _obligation_ to pay pendency interest.  The remaining question is whether the improbability of payment prevents Kellogg from deducting the interest.

### C.

Finally, I return to an application of Fahs, in which a bankruptcy trustee attempted to deduct interest owed on mortgage indentures that accrued during the pendency of bankruptcy.  The government objected, in part, on the ground that the interest was "not accruable and deductible for income tax purposes in view of the fact that there is little or no likelihood that it will ever be paid."  224 F.2d at 393.  We, however, held that "interest on an unconditional legal obligation is deductible for income tax purposes by an accrual basis taxpayer, notwithstanding the improbability of its being paid . . . ."  Id. at 395.

Contrary to the holding of the bankruptcy court here, Fahs remains the law of this circuit.[24]  Even the Tax Court has

---

[23]  Even the Tax Court has recognized the continuing validity of Fahs.  See Southeastern Mail Trans. Inc. v. Commissioner, 63 T.C.M. (CCH) 2893, 2905-06 (1992).  Apparently, it is also consistent with earlier IRS policy.  See, e.g., Rev. Rul. 70-367, 1970-2 C.B. 37 (1970) (holding that interest accrued for obligations of debtor corporation undergoing reorganization under Bankruptcy Act).  "The doubt as to the payment of such interest is not a contingency of a kind that postpones the accrual of the liability until the contingency is resolved."  Id.

[24]  See, e.g., Tampa & Gulf Coast R.R. v. Commissioner, 469 F.2d 263, 264 (5th Cir. 1972);  Lawyer's Title Guar. Fund v. United States, 508 F.2d 1, 6 (5th Cir. 1975) ("The law also is that a bare possibility of non-payment or delay in payment because of the principal's financial condition does not defeat accrual either.");  W.S. Badock Corp. v. Commissioner, 491 F.2d 1226, 1228 (5th Cir. 1974) (recognizing rule that risk of collection does not defeat fixed liability for accrual purposes).  The government does correctly note that we have created
(continued...)

-28-

recognized the continuing validity of <u>Fahs</u>.  See <u>Southeastern Mail Transp. Inc. v. Commissioner</u>, 63 T.C.M. (CCH) 2893, 2905-06 (1992).[25]  The majority opinion accepts as much.

The justification for the <u>Fahs</u> rule is simple.  As every debt is subject to the risk of non-payment, a rule requiring absolute certainty of repayment as a prerequisite to accruing and deducting interest would make I.R.C. § 163 a nullity.  No one could rely upon the accrual method.  The <u>Fahs</u> court accordingly focused instead upon the obligation to pay.  To be able to deduct a debt under the accrual method and the "all events" test, there only must be a

---

(...continued)

an exception to the rule in <u>Fahs</u>.  Where there is no possibility of eventual payment, no obligation is fixed, and therefore an interest deduction is improper. In <u>Tampa & Gulf Coast R.R.</u>, 469 F.2d at 264, for example, we recognized the general principle of <u>Fahs</u> but held that it had to give way to extreme circumstances of the case before it.  In <u>Tampa</u>, a parent and subsidiary corporation had created a tax shelter where the rent payments from the parent to the subsidiary were offset by accrued but unpaid interest payments on debts to the parent.  The court found that <u>Fahs</u> did not apply, as the debt would never be paid on account of the beneficial tax relationship between the corporations.

[25] Even the Tax Court, at times, appears to apply an approach similar to, but more restrictive than, <u>Fahs</u>.  See <u>Cohen v. Commissioner</u>, 21 T.C. 855, 857 (1954) (holding that deductions are proper, except where interest "categorically" will not be paid); <u>Jordon v. Commissioner</u>, 11 T.C. 914, 925 (1948) (same); <u>see also</u> <u>Zimmerman Steel Co. v. Commissioner</u>, 45 B.T.A. 1041 (1941) (outlining general approach), <u>rev'd</u>, 130 F.2d 113 (8th Cir. 1952).  The Third Circuit apparently has acquised in the Tax Court's approach.  See <u>Pearlman v. Commissioner</u>, 153 F.2d 560, 563 (3d Cir. 1946) (affirming Tax Court decision reported at 4 T.C. 34 (1944) that applies Tax Court's interpretation of <u>Zimmerman</u>).

The Eighth Circuit, the Eleventh Circuit, and the Court of Federal Claims, however, follow the rule we adopted in <u>Fahs</u>.  See <u>Keebey's Inc. v. Paschal</u>, 188 F.2d 113, 115-16 (8th Cir. 1951); <u>Zimmerman Steel Co. v. Commissioner</u>, 130 F.2d 1011, 1012 (8th Cir. 1942); <u>Sartin v. United States</u>, 5 Cl. Ct. 172, 176 (1984) (citing <u>Fahs</u> rule with approval); <u>cf.</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that Fifth Circuit precedent prior to circuit split is binding on the Eleventh Circuit).  The leading case not following <u>Fahs</u> originates from a district court in the Second Circuit.  See <u>In re Continental Vending Mach. Corp.</u>, 77-1 U.S. Tax Cas. (CCH) ¶ 9121 (E.D.N.Y. 1976).

fixed and unconditional obligation to pay.[26]   Accordingly, the validity of that obligation is measured at the time it is fixed, not at the future date it should be paid.

Here, there is no dispute that the unsecured debts are valid obligations to which Texas state law attaches the obligation to pay interest after they are thirty days overdue.  While the imposition of bankruptcy is probative of the uncertainty concerning the payment of the pendency interest, there is no allegation by the government, or concession by Kellogg, that the interest debt will never be paid.  As long as the debt could be paid, the obligation remains.  I would hold that the deduction was proper, and the bankruptcy court erred in refusing to follow Fahs.[27]  Accordingly, I respectfully dissent.

---

[26]   See I.R.C. §§ 163, 461; Treas. Reg. § 1.461-1(a)(2); see also, e.g., United States v. Hughes Properties, Inc., 476 U.S. 593, 600 (1986) ("[T]o satisfy the all-events test, a liability must be final and definite in amount, must be fixed and absolute, and must be unconditional.").

[27]   As this result would moot the 11 U.S.C. § 505(b) issue, I do not address it.